**Robert E. WILLIAMS, Plaintiff,**

v.

**TRANS WORLD AIRLINES, INC., Defendant.**

**Lawrence BOEDING, Plaintiff,**

v.

**TRANS WORLD AIRLINES, INC., Defendant.**

**No. 81–0790–CV–W–9, 81–0792–CV–W–9.**

United States District Court, W.D. Missouri, W.D.

June 8, 1984.

Kelly McClelland, Linde, Thomson, Fairchild, Langworthy, Kohn & Van Dyke, Kansas City, Mo., for plaintiff.

Elliott H. Shaller, New York City, Charles W. German, Stinson, Mag & Fizzell, Kansas City, Mo., for defendant.

## AMENDED ORDER DISQUALIFYING PLAINTIFFS' COUNSEL

BARTLETT, District Judge.

On April 4, 1983, defendant Trans World Airlines (TWA) filed a motion to disqualify plaintiffs' attorneys, the law firm of Linde, Thomson, Fairchild, Langworthy, Kohn and Van Dyke (the Linde, Thomson firm). Because of an imminent trial setting, a hearing was held on short notice on April 22, 1983, and the Court tentatively ruled that plaintiffs' counsel should be disqualified.

At plaintiffs' request, a second hearing was held on October 7, 1983.

The issue presented here is whether the law firm representing plaintiffs should be disqualified from further representation of the plaintiffs in this case because they also represent a person who, while employed by TWA, assisted one of defendant's attorneys with the defense of plaintiffs' claims and had access to confidential information about these cases.

### Facts

On September 11, 1981, Robert W. Williams and Lawrence Boeding filed separate complaints alleging that TWA had discriminated against them because of their age when they were involuntarily demoted by TWA on September 14, 1979. Both were represented by Kelly McClelland of the Linde, Thomson firm.

Before filing these lawsuits, Williams and Boeding had filed complaints alleging age discrimination with the Equal Employment Opportunity Commission (EEOC). In an interview statement taken by the EEOC Williams stated in part:

On September 14, 1979, I was informed by John S. Raydo, Director of Maintenance, Planning and Information Support, for the company, that I was being furloughed effective October 1, 1979. I was told that I was being furloughed because of a reduction-in-force. During that meeting, I was given the option of being furloughed or demoted to an hourly position. Mr. Raydo also suggested that I retire rather than be furloughed. I agreed to take the demotion to an hourly position.

In Boeding's statement to the EEOC he stated in part:

On 09–14–79, Mr. John S. Raydo, Director of Maintenance, Planning and Support Information told me that I was being furloughed due to a reduction in force and that I had two options: Retirement or exercise my seniority to go from my current management position of Master Information Specialist back to mechanic.

Ms. Audrey Campbell Schanck was employed by TWA from September 28, 1964, to December 30, 1982. Her last position with TWA was Manager of Personnel Administration. At no time during her employment was she asked to execute a confidentiality agreement. She was not an attorney. From time to time she assisted TWA's attorneys in investigating discrimination charges.

At the request of Larry D. McEnroe, one of TWA's attorneys, Campbell Schanck assisted McEnroe in the investigation of the charges filed with the EEOC by Williams and Boeding. Under McEnroe's supervision Campbell Schanck prepared TWA's defense to these charges. Campbell Schanck was TWA's designated representative before the EEOC.

In the latter part of February, 1980, Campbell Schanck told Raydo, who was Director-Maintenance Planning and Information Support, that McEnroe had assigned her to assist with preparing TWA's response to EEOC charges filed by several former TWA employees. She requested information about the employees, including Williams and Boeding, who had been furloughed by Raydo from the Technical Information Support Department. Campbell Schanck inquired about the procedures used in selecting individuals for furlough.

Sometime in March, 1980, at the request of McEnroe and as part of her investigative duties under McEnroe's direction, Campbell Schanck attended a meeting with Raydo and McEnroe. At this meeting, McEnroe asked Raydo "to prepare various documents and provide certain information to me and Campbell Schanck in order to prepare for the presentation to the EEOC of TWA's position...." on the Williams and Boeding charges. McEnroe Affidavit, D.Ex.2. McEnroe anticipated that Williams and Boeding would file suit in federal district court at the conclusion of the EEOC proceedings. Raydo and Campbell Schanck were aware of the strong possibility that the EEOC proceeding would be followed by litigation. Initially, Raydo was "hesitant about candidly expressing his

thoughts in writing on certain matters and subject areas relating to the furloughs." *Id.* McEnroe assured Raydo that he "should feel free to, in writing, candidly explain and assess the reason why particular individuals were selected for furlough ..." because the information would be protected from disclosure by the attorney-client privilege. *Id.* Raydo understood that the documents he had been asked to prepare would be available to and used only by the TWA Legal Department and Campbell Schanck.

When Raydo prepared the requested information he marked the documents "confidential." To further preserve the statement's confidentiality, Raydo made only two copies. He gave one copy to McEnroe and one copy to Campbell-Schanck. He personally copied the document. Raydo retained the originals in a separate locked filing cabinet in his office where he stored confidential company documents. Later, Raydo made two additional copies for TWA's trial counsel in these cases. Raydo has made no other copies and has not shown these documents to anyone else.

After furnishing the written information to McEnroe and Campbell-Schanck, Raydo responded orally to additional questions from McEnroe and Campbell Schanck about the Williams and Boeding furloughs. As a result of her investigation, Campbell Schanck prepared various documents relating to plaintiffs' furloughs. Some of these documents were filed with the EEOC and others were for TWA's internal purposes only. After Williams and Boeding filed these lawsuits, Elliot Shaller, lead counsel for TWA in these cases, discovered in TWA's file a frank and candid analysis of plaintiffs' charges prepared by Campbell Schanck. Campbell Schanck told Shaller that she had prepared this document for TWA's Legal Department at McEnroe's request. Shaller objected to producing the document for inspection by plaintiffs' counsel on the ground that it was work product.

On December 30, 1982, Campbell Schanck was furloughed by TWA. She telephoned Kelly McClelland, plaintiffs' at-

torney in these cases, at his home sometime late in December, 1982. Campbell Schanck told McClelland that she wanted the Linde, Thomson firm to represent her in pursuing a discrimination claim against TWA. McClelland "asked for some brief information about me and the employer and then informed me of a date and time that I could come in and meet with Mr. John Mueller, III of Linde Thomson." Campbell Schanck Affidavit, P.Ex. 2.

On January 10, 1983, Campbell Schanck filed a charge with the EEOC alleging that TWA discriminated against her. The EEOC was advised that all correspondence should be directed to Mueller of the Linde, Thomson firm.

During January, 1983, McClelland told Shaller over the telephone that the plaintiffs now had an "in-house expert" on TWA's policies and procedures.

On or about February 7, 1983, Shaller received a copy of a letter to the president of TWA signed by McClelland and Mueller regarding Campbell Schanck's discrimination charge. The letter stated in part that "upon completion of the requisite sixty-day conciliation period, we will agressively pursue Ms. Audrey H. Campbell Schanck's cause of action and obtain a judicial resolution if it becomes necessary."

In a letter from McClelland to Shaller dated February 14, 1983, McClelland urged TWA to settle the Williams and Boeding cases. In a thinly veiled reference to Campbell Schanck McClelland stated:

> [A]s you are well aware from my recent correspondence on behalf of another client to Mr. C. E. Meyer, *we now have TWA information regarding the reduction in force in 1979* and specifically, the Technical Information Support Department. *Information regarding personnel changes that occurred in that department after the 1979 furlough through December, 1982, is readily available to us and will be utilized by us at the trial. Our witness is known to you and I am sure you will agree, is very knowledgeable of TWA's actions*

*affecting Mr. Boeding and Mr. Williams* (emphasis supplied).

On March 2, 1983, plaintiffs sought leave to amend their complaint to allege that TWA retaliated against them in 1979, 1980, and 1982, for filing charges with the EEOC by not selecting them for vacant positions in the Technical Information Support Department. Plaintiff stated in support of this motion that "plaintiff does not intend to call any witnesses in proving up the allegations contained in Counts III and IV, other than defendant's employees with the exception of one prior employee by the name of Audrey Campbell Schanck."

After defendant TWA filed its motion to disqualify plaintiffs' counsel on April 4, 1983, Stephen Scholl of the Linde, Thomson firm interviewed Campbell Schanck and asked her whether she had any information about Williams and Boeding. She stated to him that she had no specific recollection of the Williams and Boeding cases. Campbell Schanck in her affidavit stated that "[i]t would be almost impossible for me to recall one or two individual cases out of the numerous cases I worked on during the massive reduction in force at TWA." Campbell Schanck also stated that she had no confidential documents in her possession. Nevertheless, plaintiffs still intended to use Campbell Schanck as a witness at trial. Scholl and McClelland Affidavits, P.Exs. 4 & 5.

## Discussion

TWA contends that plaintiffs have gained an unfair advantage in this litigation because Linde, Thomson has access to confidential and privileged information through its representation of Campbell Schanck. Therefore, TWA asserts that Linde, Thomson's continued representation of plaintiffs creates an appearance of impropriety prohibited by Canon 9. Canon 9 states: "A lawyer should avoid even the appearance of professional impropriety."

Relying on *Fred Weber, Inc. v. Shell Oil Co.*, 566 F.2d 602 (8th Cir.1977),[1] plaintiffs resist disqualification arguing that defendant has failed to establish that any specifically identifiable impropriety has occurred. Therefore, this Court should defer to plaintiffs' interest in being represented by counsel of their choice.

In *Weber*, defendants Shell and Amoco sought to disqualify the Lashly law firm which represented plaintiff. Shell and Amoco had also been defendants in a previous criminal anti-trust action. The Lashly law firm had represented co-defendants of Shell and Amoco in that anti-trust action. Shell and Amoco alleged "that members of the Lashly firm, by reason of their representation in *American Oil,* had access to confidential information [debriefing memoranda of grand jury testimony] in the files of Amoco's counsel, and were present at meetings of counsel for all defendants at which defense strategy was discussed." *Id.* at 605. Shell and Amoco relied on Canons 4, 5 and 9 of the ABA Code of Professional Responsibility in moving to disqualify the Lashly firm from representing Weber.

The district judge concluded that counsel for the criminal defendants had agreed to work together in defense of the indictment "but that no member of the Lashly firm had represented Shell or Amoco or had received any confidential information." *Id.* Therefore, the district judge denied the motion to disqualify.

In affirming the district court, the Eighth Circuit Court of Appeals stated that:

[u]nlike those of Canons 4 and 5, the broad injunction of Canon 9 against the "appearance of impropriety" relates to the entire spectrum of lawyer conduct. That no unethical or untoward act may have occurred is implicit in the canon's emphasis on "appearance." The conduct under scrutiny must therefore be evaluated in an "eye of the beholder" context, and the lawyer must be disqualified when an actual appearance of evil exists, though there be no proof of actual evil. *Id.* at 609.

However, the Court, quoting from *Woods v. Covington County Bank,* 537 F.2d 804, 813 (5th Cir.1976), cautioned that:

'It does not follow, however, that an attorney's conduct must be governed by standards which can be imputed only to the most cynical members of the public. Inasmuch as attorneys now commonly use disqualification motions for purely strategic purposes, such an extreme approach would often unfairly deny a litigant the counsel of his choosing. Indeed, the more frequently a litigant is delayed or otherwise disadvantaged by the unnecessary disqualification of his lawyer under the appearance of impropriety doctrine, the greater the likelihood of public suspicion of both the bar and the judicary ... Consequently, while Canon 9 does imply that there need be no proof of actual wrongdoing, we conclude that there must be at least a reasonable possibility that some specifically identifiable impropriety did in fact occur.' *Id.* at 609.

Applying these principles to the situation in *Weber*, the Court concluded that because of the nature of the relationship between individual counsel for separate co-defendants in the previous suit, because of the prompt disposition of the earlier suit on a

1. In *Firestone Tire & Rubber Co. v. Risjord,* 612 F.2d 377 (8th Cir.1980), *Weber* was expressly overruled because the Court concluded that an order denying a motion for disqualification of counsel was not final for purposes of appeal. *Id.* at 378. However, the United States Supreme Court vacated and remanded *Firestone* at 449 U.S. 368, 101 S.Ct. 669, 66 L.Ed.2d 571 (1981). The Supreme Court agreed with the Court of Appeals that orders denying motions to disqualify counsel are not appealable final decisions under 28 U.S.C. § 1291. The Supreme Court reversed because the Court of Appeals had gone ahead and affirmed the district court's denial of the motion. Whether *Weber* has been overruled by the Eighth Circuit's vacated opinion in *Firestone* is uncertain. Even if *Weber* has been overruled on the jurisdictional ground, the approach taken by the Court of Appeals in analyzing and applying Canon 9 has not been questioned. Furthermore, as stated in this opinion, plaintiffs rely on *Weber* to support their opposition to the disqualification motion.

purely procedural basis, and because of the limited discussions among counsel for the co-defendants, "no basis exists for presuming that confidential information was obtained which presumption would in turn serve as the genesis of an appearance of impropriety." *Id.* at 610. Without such a presumption the burden was on Shell and Amoco to show that confidential information was actually imparted to the law firm, which Shell and Amoco failed to do.

In the circumstances of this case, refusal to disqualify the Lashly firm is not seen as giving scandal to the profession; or as risking injury to its integrity and honor; or as discouraging public respect for the law or the courts; or as disabling the confidence, respect and trust which underpin the profession; or as limiting the public thrust of Canon 9 or its guardianship over the reputation of the lawyer and his profession.

*Id.* at 610.

Here, it is not contested that Campbell Schanck, while assisting TWA's lawyers, obtained confidential information about the instant cases. Therefore, the factual issue which troubled the *Weber* court is not present in this case. Nevertheless, the *Weber* court's comments about a correct Canon 9 analysis are applicable to this case. The issue here is whether there is some reasonable possibility that some specifically identifiable impropriety did, in fact, occur.

*Hull v. Celanese Corp.*, 513 F.2d 568 (2d Cir.1975), illustrates the impropriety inherent in the instant case. In *Hull*, Delulio, a former attorney on the corporate legal staff of Celanese, sought to intervene as a plaintiff in a Title VII case pending against Celanese. Delulio had been working on Celanese's defense to Hull's claim when the *Hull* complaint was filed. Celanese opposed the proposed intervention and additionally sought to disqualify the law firm which represented both the original plaintiff and Delulio.

The district judge had stated that there was "some evidence ... of the possibility that Delulio, unquestionably possessed of information within the attorney-client privilege, did in fact transmit some of it to the Rabinowitz firm, consciously or unconsciously." *Id.* at 570. Therefore, the continued retention of the Rabinowitz firm would create at least the appearance of impropriety due to the ongoing possibility for improper disclosure. The trial court concluded that the interests of Celanese in a trial free from the risk of even inadvertent disclosures of confidential information and the public interest in the scrupulous administration of justice outweighed plaintiff's interest in freely selecting counsel of her choice.

On appeal, the Rabinowitz firm maintained that they had carefully cautioned Delulio not to reveal any information received in confidence as an attorney for Celanese but rather to confine her revelations to the facts of her own case. The law firm argued that they had never gotten any confidential information either directly or indirectly which they could use either consciously or unconsciously.

Although the Court of Appeals credited the efforts of the Rabinowitz firm to avoid the receipt of any confidences, the Court made it clear that an inquiry into whether confidential information was in fact received by the Rabinowitz firm was not necessary. Disqualification of the firm from representing both Delulio and the original plaintiffs, or either of them, was necessary to preserve the spirit of Canon 9.

Rather, "where 'it can reasonably be said that in the course of the former representation the attorney *might* have acquired information related to the subject matter of his subsequent representation,' it is the court's duty to order the attorney disqualified." The breach of confidence would not have to be proved; it is presumed in order to preserve the spirit of the Code.

. . . . .

The preservation of public trust both in the scrupulous administration of justice and in the integrity of the bar is paramount. Recognizably important are Hull's right to counsel of her choice and the consideration of the judicial economy

which could be achieved by trying these claims in one lawsuit. These considerations must yield, however, to considerations of ethics which run to the very integrity of our judicial process.

*Id.* at 572 (citations omitted).

Here, there is an attorney-client relationship between Campbell Schanck and the Linde, Thomson firm just as there was in *Hull* between Dululio and the Rabinowitz firm. The fact that Campbell Schanck is not an attorney does not make it less likely that she would reveal confidential information to the attorney representing her in a lawsuit against her former employer. In fact, a persuasive argument can be made that a non-lawyer would be more likely to reveal confidential information. Presumably, an attorney would be acutely aware of his or her ethical obligation not to reveal confidences of a former client. A non-lawyer might not be as sensitive to the need to safeguard the confidences of his or her previous employer gained while working with an attorney.

Therefore, as in *Hull*, a presumption arises that confidences have been imparted by Campbell Schanck to Linde, Thomson. To hold a hearing on whether Campbell Schanck has conveyed confidential information would very likely compromise the confidences. *Analytica, Inc. v. NPD Research, Inc.*, 708 F.2d 1263, 1269 (7th Cir. 1983).

In the instant case there are facts that support the assumption that confidential information has been imparted from Campbell Schanck to the Linde, Thomson firm. For instance, in a letter dated February 14, 1983, to TWA's attorney Shaller, plaintiffs' attorney McClelland called attention to his recent acquisition of information regarding the reduction in force in the TWA department where plaintiffs had worked. McClelland referred specifically to information regarding personnel changes in that department after the 1979 furlough through December, 1982, as being "readily available and will be utilized by us at trial." McClelland then made clear that a person was the source of this information when he said "our witness is known to you and I am sure you will agree is very knowledgeable of TWA's actions affecting Mr. Boeding and Mr. Williams." Plaintiffs' attorneys do not contest that this reference was to Campbell Schanck.

In addition, a reasonable member of the public or of the bar might assume that Campbell Schanck's Linde, Thomson attorney would encourage her to disclose fully everything she knew about the personnel policies of TWA. Even if Campbell Schanck had no immediate recollection, her memory could be triggered by pretrial preparation of her case or of plaintiffs' cases where she will be a witness.

Plaintiffs argue that if Campbell Schanck were to divulge confidential information, it would be to her attorney, Mueller, and not to plaintiffs' attorneys, McClelland and Scholl. However, Mueller, McClelland and Scholl are all members of the same law firm. In *State of Arkansas v. Dean Food Products Co.*, 605 F.2d 380 (8th Cir.1979),[2] the court concluded that confidential information possessed by one attorney in a law firm is presumed shared among his partners and employees. Linde, Thomson has taken no steps to safeguard against the future disclosure by Campbell Schanck of confidential information.

---

**2.** In *Firestone Tire & Rubber Co. v. Risjord*, 612 F.2d 377 (8th Cir.1980), *Dean Food Products* was expressly overruled because the Court concluded that an order denying a motion for disqualification of counsel was not final for purposes of appeal. *Id.* at 378. However, the United States Supreme Court vacated and remanded *Firestone* at 449 U.S. 368, 101 S.Ct. 669, 66 L.Ed.2d 571 (1981). The Supreme Court agreed with the Court of Appeals that orders denying motions to disqualify counsel are not appealable final decisions under 28 U.S.C. § 1291. The Supreme Court reversed because the Court of Appeals had gone ahead and affirmed the district court's denial of the motion. Therefore, it is not entirely clear whether *Dean Food Products* has been overruled by the Eighth Circuit's vacated opinion in *Firestone*. Even if *Dean Food Products* has been overruled on the jurisdictional ground, the presumption that confidential information possessed by one attorney in a law firm has been shared among others in the firm has not been questioned.

Linde, Thomson has neither cautioned Campbell Schanck not to reveal any confidential information acquired while working as an agent for TWA's attorney, nor has Linde, Thomson attempted to insulate McClelland and Scholl, Williams and Boeding's attorneys, from Campbell Schanck and any information she might impart to her attorney, Mueller. In fact, it would appear that Williams and Boeding's attorneys have free access to Campbell Schanck and any information she has about TWA. For instance, McClelland signed a letter on Campbell Schanck's behalf to TWA's president, Campbell Schanck has been listed as a witness in these cases, and Scholl interviewed Campbell Schanck as soon as the motion to disqualify was filed to determine whether Campbell Schanck had any confidential information.

Although the attorney-client relationship in this case and the resulting inferences that arise from that relationship about the exchange of information are identical to *Hull*, there is an obvious difference between this case and *Hull*; Campbell Schanck is not a lawyer. Therefore, the question must be asked whether that fact makes a difference in assessing whether an appearance of impropriety prohibited by Canon 9 arises from Linde, Thomson's joint representation of Campbell Schanck and the plaintiffs in this case.

■ Non-lawyer personnel are widely used by lawyers to assist in rendering legal services. Paralegals, investigators, and secretaries must have ready access to client confidences in order to assist their attorney employers. If information provided by a client in confidence to an attorney for the purpose of obtaining legal advice could be used against the client because a member of the attorney's non-lawyer support staff left the attorney's employment, it would have a devastating effect both on the free flow of information between client and attorney and on the cost and quality of

the legal services rendered by an attorney. Every departing secretary, investigator, or paralegal would be free to impart confidential information to the opposition without effective restraint. The only practical way to assure that this will not happen and to preserve public trust in the scrupulous administration of justice is to subject these "agents" of lawyers to the same disability lawyers have when they leave legal employment with confidential information.

Plaintiffs argue that this court should disqualify counsel only if one of the two situations described in *Board of Education of New York City v. Nyquist*, 590 F.2d 1241 (2d Cir.1979) and quoted with approval in *Armstrong v. McAlpin*, 625 F.2d 433 (2d Cir. en banc 1980), *vacated*, 449 U.S. 1106, 101 S.Ct. 911, 66 L.Ed.2d 835 (1981) [3] is presented.

> "(1) where an attorney's conflict of interests in violation of Canons 5 and 9 of the Code of Professional Responsibility undermines the court's confidence in the vigor of the attorney's representation of his client ... or more commonly (2) where the attorney is at least potentially in a position to use privileged information concerning the other side through prior representation, for example, in violation of Canons 4 and 9, thus giving his present client an unfair advantage...."

*Id.* at 444. Unless an attorney's conduct tends to "taint the underlying trial" in one of these two ways, plaintiffs urge that the possible "appearance of impropriety is simply too slender a reed on which to rest a disqualification order...." *Nyquist*, 590 F.2d at 1247.

In *Armstrong*, a securities fraud derivative suit, a motion had been made to disqualify the Gordon law firm from representing the receiver because it had employed Altman, an attorney who had worked for the SEC. While employed by the SEC, Altman had supervised the SEC

---

**3.** The Second Circuit's decision in *Armstrong* was vacated because *Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 101 S.Ct. 669, 66 L.Ed.2d 571 (1981) ruled that the denial of a motion to disqualify is not an appealable order.

449 U.S. 1106, 101 S.Ct. 911. Even though *Armstrong* was vacated, it will be fully discussed because plaintiffs rely on the decision and because much of the decision is based on the approach taken in *Nyquist*.

case which resulted in the appointment of Armstrong as receiver of the Capital Growth companies. Shortly before Armstrong hired the Gordon firm as substitute counsel, Altman had joined the firm. The trial court denied the disqualification motion because the Gordon firm had carried out the letter and spirit of relevant bar association ethical rulings and the integrity of the trial was not threatened. Proper screening rather than disqualification was the appropriate solution.

After a panel of the Second Circuit Court of Appeals reversed, the case was reheard en banc. Because of uncertainty over what is ethical, the Court adopted a restrained approach that focuses primarily on preserving the integrity of the trial process.

> We recognize that a rule that concentrates on the threat of taint fails to correct all possible ethical conflicts. In adopting this approach, we do not denigrate the importance of ethical conduct by attorneys practicing · in this courthouse or elsewhere, and we applaud the efforts of the organized bar to educate its members as to their ethical obligations. However, absent a threat of taint to the trial, we continue to believe that possible ethical conflicts surfacing during a litigation are generally better addressed by the 'comprehensive disciplinary machinery' of the state and federal bar, see *Nyquist*, supra, 590 F.2d at 1246, or possibly by legislation. While there may be unusual situations where the 'appearance of impropriety' alone is sufficient to warrant disqualification, we are satisfied that this is not such a case.

*Armstrong*, 625 F.2d at 445–46 (footnotes omitted).

The Circuit Court agreed with the trial judge's rejection of the claim that the trial would be tainted by the Gordon firm's continued representation of the receiver. Because no threat of taint existed, the Court believed that the fairness and efficiency of the judicial process "would be disserved by an order of disqualification...." *Id.* at 446.

By focusing on the threat of taint to the integrity of the trial process, *Armstrong* is consistent with *Hull* and *Weber*. By attempting to restrict the scope of Canon 9 to two situations, *Armstrong* conflicts with *Weber*. ("Unlike those of Canons 4 and 5, the broad injunction of Canon 9 against the 'appearance of impropriety' relates to the entire spectrum of lawyer conduct." *Weber*, 566 F.2d at 609.)

In the instant cases, the potential for unfair discovery of information through private consultation rather than through normal discovery procedures threatens the integrity of the trial process. *NKC Organization Ltd. v. Bregman*, 542 F.2d 128, 132 (2d Cir.1976). The Linde, Thomson firm has direct access to confidential information because of its representation of Campbell Schanck. No effort has been made to prevent the Linde, Thomson attorneys representing Williams and Boeding from having access to Campbell Schanck and any information she may furnish to her Linde, Thomson attorney. Furthermore, plaintiffs' counsel have reminded TWA that Campbell Schanck had been in a position to learn a great deal about the Williams and Boeding cases. Plaintiffs' counsel have threatened TWA with Campbell Schanck's testimony if TWA does not capitulate to plaintiffs' settlement demand. The message was crystal clear; Campbell Schanck's knowledge about these cases is at plaintiffs' disposal and will be used if TWA defends itself.

TWA's efforts to block the direct use at trial of confidential information obtained from Campbell Schanck would not erase the threat to the integrity of the trial process. A reasonable member of the public or of the bar would share with TWA the nagging suspicion that plaintiffs' trial prep-aration and presentation of their cases had benefitted from confidential information obtained from Campbell Schanck. All further proceedings in this case, including any trial, would be tainted by this reasonable suspicion. The only effective way at this time to protect the trial process from this taint is to sever· the connection between Campbell Schanck and plaintiffs, i.e., their common counsel.

■ This Court shares with the *Armstrong* court a "considerable reluctance" to disqualify counsel.[4] "This reluctance probably derives from the fact that disqualification has an immediate adverse effect on the client by separating him from counsel of his choice, and that disqualification motions are often interposed for tactical reasons." *Nyquist,* 590 F.2d at 1246. However, the fairness and integrity of the judicial process and TWA's interest in a trial free from the risk that confidential information has been unfairly used against it must also be considered.

The Linde, Thomson firm argues that its association with plaintiffs and its familiarity with the particulars of these cases and with the controlling law make them "unique and critical to effective prosecution of this litigation." Disqualification of the Linde, Thomson firm will undoubtedly work a hardship on plaintiffs. However, this hardship can be reduced by allowing portions of Linde, Thomson's work product to be turned over to new counsel and by allowing limited consultation with disqualified counsel for the purpose of explaining the work product. *International Business Machines Corp. v. Levin,* 579 F.2d 271, 283 (3d Cir.1978); *Black v. State of Missouri,* 492 F.Supp. 848, 871 (W.D.Mo. 1980).

Linde, Thomson argues that because TWA waited three months to file its motion to disqualify and because the motion was filed a week and one-half before trial, the motion should be viewed as "a strategic tool to deprive plaintiffs of counsel of their choice after substantial preparation has been completed." TWA responds that it regards the filing of a motion to disqualify as an extremely serious matter necessitat-

ing extensive research and consultation. TWA counsel also state that it took some time to investigate the extent of Campbell Schanck's involvement with plaintiffs' cases while she was employed by TWA. Furthermore, TWA explains the delay by noting the "rash of events" in these two cases during the first three months of 1983 —plaintiffs attempted to amend the complaint to add several new causes of action, and plaintiffs took additional depositions.

■ Under the circumstances, particularly the fact that the events giving rise to the motion did not occur until late December, 1982, and early 1983, the filing of the motion in April, 1983, was timely.

■ For the reasons stated orally on April 22, 1983, when the Court tentatively disqualified the Linde, Thomson firm and in this opinion, the fairness and integrity of the judicial process and TWA's legitimate interest in a trial free from the risk that confidential information has been unfairly used against it outweighs plaintiffs' interest in being represented by this particular law firm. To refuse to disqualify Linde, Thomson would leave an appearance of impropriety hanging over these cases which would taint the proceedings.

■ The Linde, Thomson law firm may turn over to plaintiffs' new counsel all work product and other information which was developed or discovered *before the date that Campbell Schanck became a client of the firm.* Any information developed or created after that date should not be turned over to or communicated in any way, directly or indirectly, to new counsel. Obviously, no information obtained from Campbell Schanck should be communicated in any way, directly or indirectly, to new counsel. With the restriction that no infor-

**4.** Also, this Court agrees with the *Armstrong* court that alleged ethical violations should be left to federal or state disciplinary machinery unless the integrity of the judicial process is threatened. Here, plaintiffs' counsel presented this matter to the Missouri Advisory Committee. Although the Committee declined to give advice on questions which referred specifically to these two cases, it did advise that the Linde, Thomson firm could continue to represent other similarly situated plaintiffs even if Campbell Schanck had been involved in the investigation of their cases.

The Committee concluded that continued representation by Linde, Thomson would not constitute an appearance of impropriety. The Committee rendered its opinion on a factual presentation by the Linde, Thomson firm only. As a result, the Committee was denied full development of the facts. Furthermore, the Committee's "yes" and "no" answers to the questions posed by the Linde, Thomson firm do not reflect consideration of the significant issues discussed in this opinion.

mation is to be communicated to or discussed with new counsel which was developed after Campbell Schanck became a client of the Linde, Thomson firm, plaintiffs' present counsel may, during the thirty days after plaintiffs retain new counsel, consult with new counsel for the purpose of explaining the issues and current status of these cases. As soon as Linde, Thomson is advised of the identity of new counsel, a copy of this opinion should be furnished to new counsel.

IT IS SO ORDERED.