KAPCO MANUFACTURING
COMPANY, INC., Plaintiff,

v.

C & O ENTERPRISES, INC., et
al., Defendants.

No. 84 C 10129.

United States District Court,
N.D. Illinois, E.D.

Oct. 17, 1985.

Eugene F. Friedman, Eugene F. Friedman, Ltd., Chicago, Ill., for plaintiff.

Robert M. Tarnoff, Daniel E. Beederman, Schoenberg, Fisher & Newman, Ltd., Chicago, Ill., for A.G. Busch Inc., Bruce Creager, Richard Wharton, and Richard Kinzalow.

Marvin A. Tenenbaum, M. Marshall Seeder, Alexander, Unikel, Bloom, Zalewa & Tenenbaum, Ltd., Chicago, Ill., for C & O Ent. and Thomas Carter.

Robert A. Lewanthal, Fred Sudak & Associates, Chicago, Ill., for Roy Thomas, Inc., Roy Jackson, Thomas Fogarty, and Margaret Groves.

Thomas A. Reynolds, III, Winston & Strawn, Chicago, Ill., for Texaco, Inc.

## MEMORANDUM OPINION AND ORDER

ROVNER, District Judge.

Presently pending before this Court is the motion of plaintiff Kapco Manufacturing Company, Inc. ("Kapco") to disqualify the attorneys representing defendants C & O Enterprises, Inc. ("C & O"), Tom Carter, and Jack O'Neill. Eugene F. Friedman of the firm of Eugene F. Friedman, Ltd. represents Kapco. The law firm sought to be disqualified is Alexander, Unikel, Bloom, Zalewa & Tenenbaum, Ltd. ("the Alexander firm"), and the attorney whose disqualification is directly at issue is a partner in that firm, Marvin M. Tenenbaum. Kapco has also requested an injunction against all of the employees of the firm, prohibiting them from disclosing or discussing any information they may have in this suit with anyone.

This lawsuit, although less than one year old, has a lengthy and complex procedural history. Kapco filed its eleven count complaint against a multitude of defendants on November 23, 1984 alleging, *inter alia,* that the defendants infringed Kapco's trademark rights in the name DASH–GO for car starters. Less than one month later, after a lengthy pretrial conference with this Court on December 20, 1984, the case was dismissed as settled between all the parties. The terms of the settlement agreement were read into the record by the attorneys on that date and transcribed by the court reporter. Although the case was dismissed, this Court retained jurisdiction to enforce the settlement agreement.

Subsequent disputes between the parties as to the substance and meaning of the settlement agreement, however, led to a plethora of motions and ultimately to three published opinions, two in the District Court and one in the United States Court of Appeals for the Seventh Circuit: *Kapco Manufacturing Co., Inc. v. C & O Enterprises, Inc., et al.,* 605 F.Supp. 253 (N.D.Ill. 1985) (Bua, J.);[1] *Kapco Manufacturing Co., Inc. v. C & O Enterprises, Inc., et al.,* 773 F.2d 151 (7th Cir.1985); *Kapco Manufacturing Co. v. C & O Enterprises, Inc., et al.,* 108 F.R.D. 55 (N.D.Ill.1985) (Rovner, J.).

The procedural history of this case and the flurry of motions filed by Kapco are adequately set forth in the published opinions and, for the sake of economy, will not be repeated here. Suffice it to state for present purposes that after Judge Bua denied Kapco's motion to reinstate the case on March 29, 1985, *Kapco,* 605 F.Supp. 253, and after this Court denied Kapco's motion to reconsider Judge Bua's order on April 30, 1985, Kapco filed the instant motion to disqualify Tenenbaum and the Alexander

---

1. Judge Nicholas J. Bua was hearing Judge Rovner's cases in her absence due to illness.

firm and for an injunction on May 15, 1985.[2]

After full briefing on the motion to disqualify was completed, this Court held an evidentiary hearing on October 3 and 4, 1985. For the reasons stated below, the motion to disqualify and for an injunction is denied.

*Facts* [3]

Friedman's firm presently numbers two attorneys, himself and an associate, Bruce W. Craig. Although the Friedman firm shares office space with another small firm, it is separate and distinct from that firm, with separate files and office personnel.

Ms. Patricia C. Wyatt was Friedman's main secretary and office manager from December 3, 1981 to sometime in April, 1985. On May 6, 1985, Ms. Wyatt began working full time as a secretary for partner Richard Alexander of the Alexander firm. Until approximately December, 1980, she had previously worked as a secretary for Mr. Alexander prior to her employment with Friedman in December, 1981.

As Friedman's secretary, her duties were wide ranging. She testified that she did everything for Friedman, from secretarial and clerical duties to filing papers in court and acting as a messenger. There is no testimony, however, that she ever performed services such as legal or fact investigation, research, or analysis. In any event, she had complete and free access to Kapco's files, which were numerous because Kapco is or had been involved in approximately 10 to 15 cases as a plaintiff or defendant since its inception several years ago. Friedman acts as Kapco's counsel on all litigated matters and on most general matters. Kenneth Rubel, Kapco's president and sole shareholder, engaged Friedman's services approximately three years ago.

According to Friedman, Craig, and Rubel, Ms. Wyatt received substantial amounts of confidential information concerning Kapco and this litigation while she worked for Friedman. Ms. Wyatt did not contest this assertion. In particular, Friedman, Rubel, and Craig testified that she attended a luncheon with them on March 25, 1985 at the Italian Village Restaurant in Chicago at which they discussed Kapco's possible courses of action on several motions pending before Judge Bua. At that time, they discussed the possibility of taking an appeal, and they discussed strategy in other cases in which Kapco was involved.[4]

At least until early 1985, Friedman and Ms. Wyatt apparently enjoyed a cordial professional relationship and a personal friendship as well. Although Friedman had occasion to reprimand her for using his word processing equipment to do typing for one of his clients after hours without informing him that she was doing so,[5] and also without informing Friedman that she had dated this client, he gave her regular raises. Friedman and Ms. Wyatt also met

---

**2.** Kapco filed a similar motion in the Seventh Circuit, which that court did not decide because it dismissed Kapco's appeal from this Court's denial of the motion to reconsider the denial of the motion to reinstate for lack of subject matter jurisdiction as an interlocutory appeal from a non-final order.

**3.** The facts set forth herein are the facts this Court has found after the conclusion of the evidentiary hearing. Although it is arguably not necessary for this Court to set forth its findings of fact and conclusions of law on a motion to disqualify counsel pursuant to Fed.R.Civ.P. 52(a), this Court has chosen to do so in the format of this opinion. *See Safeway Stores, Inc. v. Safeway Quality Foods, Inc.,* 433 F.2d 99, 102 (7th Cir.1970).

**4.** Friedman's 15 year old daughter, who occasionally worked in his office, was also present at this luncheon. Although there was some question as to whether her presence at the luncheon destroyed any attorney-client privilege attached to the confidential communications, this Court ruled that the privilege applied because Friedman testified that she worked for him by performing routine office tasks, and she was paid on an hourly basis. Tenenbaum did not effectively discredit this testimony on cross-examination.

**5.** Friedman testified that he told her that he thought she should pay a rental fee of $10 to $15 per hour for use of the word processor.

on occasion after work for drinks, he lent her $3,000 when she needed money during her custody battle, she called him and his wife to discuss personal matters at home, and she borrowed books from him occasionally. In mid-February, 1985, Friedman and Ms. Wyatt had a dispute over her salary raise and vacation time. During the course of their discussions, Ms. Wyatt told Friedman that she had a job offer from another firm, the name of which she did not divulge to him. Bruce Craig, Friedman's associate, subsequently engaged in a discussion with Ms. Wyatt in an effort to convince her not to leave the Friedman firm. During that conversation, she told Craig that she had a job offer from the Alexander firm, but that Tenenbaum "threw a fit" when he learned that the Alexander firm might hire her because of the potential conflicts regarding this on-going litigation.[6]

Sometime in late February or early March, 1985, Ms. Wyatt told Friedman that she would remain in his employment. She continued to work on Kapco matters—including attending the March 25 luncheon described above—until April 11, 1985, when she informed Friedman that she would leave his employment effective April 30, 1985. She refused to tell Friedman or Craig where she would be working despite Friedman's specific inquiries, explaining only that she did not want Friedman to call her during business hours to find out where various items and files were located in the office. She also refused to answer his direct questions as to whether she would be working for anyone having any connection with any matters handled by his office. Indeed, she even refused to answer when Friedman asked her directly whether she would be working with the Alexander firm because he knew that she was personally friendly with one of the partners of that firm, James Zalewa. She gave instructions to her family and friends not to tell Friedman where she would be employed. No one at the Alexander firm informed him of Ms. Wyatt's impending employment with that firm.

Tenenbaum testified that he was indeed concerned when he first learned in early 1985 from his partners that the Alexander firm was considering hiring Ms. Wyatt as the secretary to Mr. Alexander. He told his partners that he had settled the *Kapco* case with Friedman but that because Friedman's motion to reinstate was pending, it was "inadvisable" to offer her employment. They agreed. On March 26, 1985, Judge Bua denied the motion to reinstate, and Tenenbaum told his partners that, although he continued to have concerns, they could extend an offer of employment to Ms. Wyatt because Mr. Alexander needed a secretary. His concerns now centered not around any potential conflict of interest but around what Friedman might do to Ms. Wyatt or to his firm if he found out she was employed by the Alexander firm.[7]

Ms. Wyatt stated that she too was concerned because Mr. Friedman specifically told her when she left his office that from now on, she would be "fair game."[8] She also stated that, aside from disputes over a salary raise and vacation time, she decided in early 1985 to seek employment elsewhere because Friedman frequently used foul language in the office, made crude remarks about women, told off-color jokes, and referred to opposing counsel, including

---

6. Craig did not relay the substance of this conversation with Ms. Wyatt to Friedman until May, 1985. He testified that he understood from Ms. Wyatt that the offer from the Alexander firm at that point "was no longer current; it was no longer a topic of discussion."

7. Tenenbaum testified that he was concerned about Friedman's possible retribution because Friedman had at one point stated that he was withdrawing from representing Kapco in this litigation and then did not do so, because Friedman had misquoted him on occasion, and because Friedman had sent him several letters which Tenenbaum considered to be unprofessional.

8. She testified that she took this statement to mean that she would be subject to Friedman's propositions and flirtations, although she later admitted that Mr. Friedman had never engaged in such conduct.

Tenenbaum, in profane terms.[9] She telephoned the Alexander firm in early 1985 to ask if they had a position available, and the firm responded negatively. She subsequently obtained a tentative offer from them that, she testified, wasn't confirmed until April, whereupon she accepted the offer and gave Friedman notice that she was leaving.

On May 6, 1985, she began to work full time as a secretary to Richard Alexander of the Alexander firm. Tenenbaum helped organize that firm in August, 1983, and it now consists of approximately 15 lawyers, only three of whom work in its litigation section. Ms. Wyatt continued to work full time until August 14, 1985, when she began to attend college full time and to work only part time for the Alexander firm.

Ms. Wyatt testified that she has had no discussions with anyone at the Alexander firm regarding Kapco or this case; that she has done no work for the Alexander firm on Kapco or this case; that no one from that firm ever has asked her any questions regarding Friedman, Kapco, this case, or Rubel; that she has volunteered no information to anyone at the firm regarding Kapco or this case; and that she has never seen the Alexander firm's file on this case and indeed does not even know where it is located.

Tenenbaum confirmed that he has had no discussions with Ms. Wyatt regarding Kapco and this case except two. The first occurred before Ms. Wyatt began her employment with the firm when she indicated to him her concerns over what Friedman might do when he discovered her new place of employment. Tenenbaum told her not to worry. The second occurred several months ago when she asked him the status of this case, and he told her only that it was still pending. Tenenbaum also stated that he has talked to all of the lawyers and employees of his firm, told them not to discuss anything regarding Kapco or this

case with Ms. Wyatt, and they have not engaged in any such discussions with Ms. Wyatt. In any event, no Kapco confidences have come to his attention or to that of Mr. M. Marshall Seeder, the only other attorney at his firm working on the case, via Ms. Wyatt. Finally, Tenenbaum testified that his clients would be prejudiced if the motion to disqualify were granted.

On May 8, 1985, Friedman learned through a circuitous method, the details of which are not important here, that Ms. Wyatt was employed by the Alexander firm. He subsequently learned from the new secretary that he hired to replace Ms. Wyatt, Ms. Lynn DeHeer, that Ms. Wyatt had been working on a part time basis in the evenings as a secretary to the Alexander firm at least until May, 1984.[10] Ironically, Ms. DeHeer, whom Friedman hired to replace Ms. Wyatt, was a secretary at the Alexander firm until May, 1984, when she left to become the secretary of a Mr. Meyers who had once been associated with that firm but then left to practice law on his own.

One week after he learned of Ms. Wyatt's current employment at the Alexander firm, and after Rubel indicated that he was very much concerned about the possible disclosure of Kapco's confidential information to the Alexander firm, Friedman filed his "emergency motion to disqualify and for an injunction" in this Court on May 15, 1985.

*Discussion*

The Seventh Circuit has noted repeatedly "two important considerations invoked in motions to disqualify counsel and emphasized the delicacy of the balance that must be maintained between them: the sacrosanct privacy of the attorney-client relationship (and the professional integrity implicated by that relationship) and the prerogative of a party to proceed with counsel of its choice." *Schiessle v. Stephens*, 717

---

**9.** Although Friedman did not deny directly that he engaged in such conduct, Kapco presented evidence through Rubel and Craig that Ms. Wyatt also engaged in such conduct.

**10.** The *Kapco* litigation did not begin until well after May, 1984.

Ms. Wyatt had also moonlighted as a cocktail waitress while working for Friedman.

F.2d 417, 419–20 (7th Cir.1983); *Analytica, Inc. v. NPD Research, Inc.*, 708 F.2d 1263 (7th Cir.1983); *LaSalle National Bank v. County of Lake*, 703 F.2d 252 (7th Cir. 1983); *Freeman v. Chicago Musical Instrument Co.*, 689 F.2d 715 (7th Cir.1982). Because disqualification is a "drastic measure which courts should hesitate to impose except when absolutely necessary," *Freeman*, 689 F.2d at 721, the Seventh Circuit has adopted a three step analysis for disqualification motions in cases involving the transfer of an attorney from one firm to another:

> First, we must determine whether a substantial relationship exists between the subject matter of the prior and present representations. If we conclude a substantial relationship does exist, we must next ascertain whether the presumption of shared confidences with respect to the prior representation has been rebutted. If we conclude this presumption has not been rebutted, we must then determine whether the presumption of shared confidences has been rebutted with respect to the present representation. Failure to rebut this presumption would also make disqualification proper.

*Schiessle*, 717 F.2d at 420 (footnote omitted).

 With these principles in mind, the first question which this Court must confront is whether to apply this analysis to a situation in which an attorney is sought to be disqualified not because a lawyer from the opposing camp has now become associated with him in some way but because a secretary-office manager has switched sides in the midst of contested litigation.

In its brief in support of the motion to disqualify, Kapco cited no federal case law which addresses this fact situation. In its answering brief, C & O has raised the spectre of the possibility that every time a secretary, office manager, docket clerk, or messenger leaves a law firm to join a firm representing an opponent of the clients of the first firm, a disqualification motion will be brought. Although this concern ordinarily would make this Court reluctant to analyze the secretary-transfer situation just as the Seventh Circuit has mandated the attorney-transfer situation must be analyzed, this case is unique. Contrary to C & O's characterization of this case, here a relatively minor employee from a large law firm has not left to join another large law firm after litigation between clients of each firm has essentially ceased; here, a key employee, who has had access to and admittedly has received confidential client communications from a two-lawyer law firm has left to become the secretary to a partner of the opposing law firm, which is also small, in the heat of litigation.[11] The fact situation presented by this case is unusual, and this Court believes that the same potential, if not actual, conflict of interest problems are posed by this case as in the typical attorney-transfer disqualification case. Accordingly, this Court will apply the analysis of the Seventh Circuit as set forth above in *Schiessle* to decide the motion to disqualify.[12]

 The Seventh Circuit's three step analysis requires first that the court determine whether a substantial relationship exists between the subject matter of the "pri-

---

**11.** Despite Kapco's failure to cite fact-relevant cases, to its credit, C & O has cited two cases in its brief opposing the motion to disqualify to this Court in which courts considered disqualification of an attorney because of the transfer of nonlawyer personnel to the opposing camp. *Williams v. Trans World Airlines, Inc.*, 588 F.Supp. 1037 (W.D.Mo.1984); *Swanson v. Wabash, Inc.*, 585 F.Supp. 1094 (N.D.Ill.1984). The courts in both cases took the disqualification motions seriously and applied analyses similar to those applied in attorney-transfer cases.

**12.** When Kapco called Friedman to the stand to testify, C & O immediately moved to disqualify Friedman because of the prohibition against an attorney acting as a witness on behalf of his client. The attorney-witness disqualification rule applies only when the attorney testifies on matters going to the merits of the litigation. *See United States v. Johnston*, 690 F.2d 638 (7th Cir.1982). Friedman was not called to testify on the merits of the *Kapco* case. Accordingly, C & O's motion to disqualify Friedman was denied.

or and present representations."[13] In this case, there is no doubt that a substantial relationship exists because the "prior and present representations" concern the same ongoing litigation. Thus, there can be no real dispute that there is a substantial relationship between the prior and present representations.

Indeed, if C & O disputes this point at all, it does so only to the extent that it somewhat disingenuously suggests that the Alexander firm merely made a firm job offer to Ms. Wyatt only after Judge Bua denied Kapco's motion to reinstate the case due to its allegation that the defendants had breached the settlement agreement and after this Court had denied Kapco's motion to reconsider Judge Bua's order. The litigation was over according to C & O at that time. This suggestion is disingenuous because Tenenbaum has repeatedly voiced his concern that the litigation between C & O and Kapco would never end because he and his clients believe that Friedman and his clients, Kapco and Rubel, have made a calculated decision to keep it alive at any cost to harass C & O and the other defendants. After having lived through over ten months of hotly contested litigation in a case which was settled and dismissed almost one year ago on December 20, 1984, and in light of the fact that in August, 1985, Kapco filed a new lawsuit against the same defendants reasserting in large part the same allegations as those in this case, this Court does not doubt that Tenenbaum's concerns of endless litigation are based in fact. Nonetheless, that very

fact illustrates that neither Tenenbaum nor C & O could have felt any real comfort that this *Kapco* litigation was at an end in early May, 1985 when Ms. Wyatt joined the Alexander firm as a secretary.[14]

The second step in the analysis requires the Court to ascertain whether the presumption of shared confidences with respect to the prior representation, or relationship, has been rebutted. The Seventh Circuit has held that the existence of a substantial relationship gives rise to a presumption of shared confidences with respect to the prior representation. *See Novo Terapeutisk Laboratorium, etc. v. Baxter Travenol Lab.,* 607 F.2d 186 (7th Cir.1979) (en banc). Kapco's argument that the presumption is irrefutable was rejected by the Seventh Circuit in *Schiessle, supra,* 717 F.2d 417, 420 n. 2. Nonetheless, as stated above, Kapco presented substantial evidence that Ms. Wyatt obtained confidential information regarding Kapco during the course of her varied duties as Friedman's secretary-office manager, and Ms. Wyatt did not deny this assertion. Accordingly, the presumption of shared confidences with respect to the prior representation has not been rebutted.

This Court must next proceed to the third step of the Seventh Circuit's analysis in *Schiessle, supra: i.e.* whether the presumption of shared confidences has been rebutted with respect to the present representation, or, in this case, relationship. C & O orally moved the Court at the close of Kapco's case to deny Kapco's motion to disqualify because Kapco failed to present

---

13. In the context of this case, because a secretary cannot be said to "represent" a client as an attorney "represents" the client, the relevant inquiry is whether a substantial nexus exists between the subject matter of the "prior and present" relationship of the secretary and her former and current places of employment. For convenience, however, this Court will use the term "representation" in this Opinion.

14. Moreover, Kapco's motion for leave to take discovery filed on April 23, 1985, was pending, C & O had not yet even filed a response to that motion, and thus there was no doubt in early May, 1985 that this litigation was on-going and would continue. Indeed, the Seventh Circuit

refused to consider Kapco's appeal on the merits from this Court's order denying Kapco's motion to reconsider Judge Bua's denial of its motion to reinstate the case because the Seventh Circuit ruled that Judge Bua's order was a nonfinal, non-appealable interlocutory order:

We dismiss the appeal for want of jurisdiction. The order of March 29, 1985 is interlocutory. It is a procedural step on the way to final judgment. It invites further actions (the creation of a formal settlement, discovery, and proceedings concerning damages).

*Kapco Manufacturing Co., Inc. v. C & O Enterprises Inc., et al.,* 773 F.2d 151, 153 (7th Cir. 1985).

any evidence that Ms. Wyatt disclosed Kapco's confidences to the Alexander firm. In support of its argument that C & O should not be required to rebut a presumption in which no evidence had been presented, C & O argued that this Court should not apply the presumption in the first place.

The application of the presumption of shared confidences is proper under the unique facts of this case. C & O argues in essence that this Court should not take a motion to disqualify seriously because only a mere secretary has changed her place of employment. C & O argues that clients seek advice from attorneys, not from secretaries, and secretaries simply do not occupy the same position of trust to other attorneys as do their partners or associates. As the court in *Williams v. Trans World Airlines, Inc.*, 588 F.Supp. 1037 (W.D.Mo.1984) stated, however:

> The fact that Campbell Schanck is not an attorney does not make it less likely that she would reveal confidential information to the attorney representing her in a lawsuit against her former employer. In fact, a persuasive argument can be made that a nonlawyer would be more likely to reveal confidential information. Presumably, an attorney would be acutely aware of his or her ethical obligation not to reveal confidences of a former client. A non-lawyer might not be as sensitive to the need to safeguard the confidences of his or her previous employer gained while working with an attorney.

588 F.Supp. at 1043.[15] Accordingly, even though Kapco presented no evidence that Ms. Wyatt had in fact disclosed confidential information to Tenenbaum or to Seeder, it would have been improper to deny the motion to disqualify at the close of Kapco's evidence because C & O had not yet presented any evidence rebutting the presumption of shared confidences with re-

spect to the present relationship between Ms. Wyatt and the Alexander firm.

■ In this regard, it is important to note the difference between the burden of proof, the burden of going forward, and the burden of persuasion. Kapco always had the burden of proof on the motion to disqualify. It could and did meet its burden of presenting a *prima facie* case that Tenenbaum and his firm should be disqualified by relying on the presumption of shared confidences once it proved that Ms. Wyatt was privy to confidential information, and that she switched employment to an opposing firm in the midst of litigation. At that point, the burden of going forward to rebut the presumption shifted to C & O but the burden of proof and the burden of persuasion always remained on Kapco. As the court stated in *Panduit Corp. v. All States Plastic Manufacturing Co.*, 744 F.2d 1564, 1579 (Fed.Cir.1984):

> The effect of a presumption of fact, here the fact of shared confidences, is to place upon the opposing party the burden of establishing the nonexistence of that fact. The burden on the opposing party, however, is limited to production of evidence. The burden of persuasion on the existence of the presumed fact remains throughout on the party invoking the presumption. The movant for disqualification, as on any other motion, bears the ultimate burden.

(Footnotes omitted.)

■ The evidence presented to rebut the presumption of shared confidences must "clearly and effectively" demonstrate that the attorney whose disqualification is at issue did not in fact possess any confidential information: he must prove that he did not have knowledge of the confidences of the client. After reviewing all of the evidence, this Court finds that C & O has clearly and effectively rebutted the pre-

---

15. In *Williams,* Ms. Campbell Schanck was a TWA employee who assisted TWA's attorneys in investigating discrimination charges. She was not an attorney. When she was furloughed by TWA, she went to the law firm representing two plaintiffs in discrimination charges against TWA which she had investigated, and she en-

gaged that firm's services. The court disqualified that law firm because there was no question that confidential information she had obtained while working for TWA had in fact been disclosed to the law firm now representing her as well as the two other plaintiffs.

sumption of shared confidences with respect to the present relationship between Ms. Wyatt and the Alexander firm and that Kapco has not met its burden of persuading this Court that in fact Ms. Wyatt has disclosed confidential information to the Alexander firm or is likely to do so in the future.

The evidence in this case clearly and effectively establishes that Tenenbaum and the Alexander firm have not received any of Kapco's confidential information from Ms. Wyatt. Tenenbaum so testified, and neither Friedman nor Kapco has presented any evidence to discredit Tenenbaum's testimony.

At most, Kapco presented evidence to impeach the credibility of Ms. Wyatt, who testified that she never has disclosed any confidential information to Tenenbaum or anyone in the Alexander firm. The evidence which purported to be impeaching concerned collateral and relatively insignificant matters,[16] and this Court, after having observed the demeanor of Ms. Wyatt, finds that she is credible on the crucial issue in this motion: whether she in fact transmitted Kapco's confidences to the Alexander firm. Ms. Wyatt testified unequivocally that she has passed on no Kapco confidences, and this Court believes that testimony.

If this Court were forced to choose between believing Ms. Wyatt or believing Rubel, Friedman, and Craig, this Court is mindful of the fact that Kapco's attorneys did not act to protect Kapco's confidences from disclosure after Ms. Wyatt announced

in mid-February, 1985 that she might leave Friedman's firm. In this regard, it is important to note that Friedman knew that Ms. Wyatt had worked for the Alexander firm before working for him; that Friedman knew that Ms. Wyatt continued to see a partner of that firm socially while she worked for Friedman; and that Craig testified that Ms. Wyatt told him she had a job offer from the Alexander firm when he met with her to dissuade her from leaving the Friedman firm. Yet Friedman, Craig, and Rubel all testified that they attended a luncheon with her on March 25, 1985 during which Kapco's confidential information was discussed.[17]

In any event, this Court need not decide the credibility battle between Ms. Wyatt on the one hand and Friedman, Craig, and Rubel on the other hand, because Tenenbaum's testimony that neither he nor anyone else at his firm to his knowledge has received Kapco's confidential information from Ms. Wyatt stands uncontradicted. Accordingly, C & O has rebutted the presumption of shared confidences, and Kapco has failed to meet its burden of persuasion on the motion to disqualify.

■ Kapco contends that to adequately rebut the presumption of shared confidences with respect to the present representation, C & O was required to and did not prove that "specific institutional mechanisms" (e.g., "Chinese Walls") had been implemented to effectively insulate against any flow of confidential information from Ms. Wyatt to the Alexander firm. *See,*

---

16. For example, Ms. Wyatt testified on cross-examination that she had not yet returned one of Friedman's books because she had not read it, despite the fact that Friedman was kind enough to return to her some Tupperware which she had left behind in her office. Friedman later introduced a letter to him in which Ms. Wyatt stated that she had "finished" with it. Whether or not Ms. Wyatt was impeached on this point, as Kapco itself has stated in its opening brief in support of its motion to disqualify, "even individuals with reasonable integrity suffer lapses." (Kapco's Memorandum in Support of Emergency Motion to Disqualify and for Injunction at 13.)

The Court reserved ruling on the admissibility of that letter and a few other documents when they were introduced. The Court now rules that those documents, Exhibits B, C, and D are admissible, although their weight is minimal.

17. Although Craig testified that he did not disclose this information to Friedman until May, 1985, as an attorney for Kapco, he had an affirmative obligation to guard Kapco's confidences. If he knew that she might join the opposing camp, and if he were seriously concerned about her possible disclosure of Kapco's confidences to Tenenbaum, he should have told Friedman immediately so that they could, at the least, guard against further disclosure of Kapco's confidences to Ms. Wyatt.

*e.g., Schiessle, supra,* 717 F.2d at 421; *La-Salle National Bank, supra,* 703 F.2d at 259. As the Seventh Circuit stated in *Schiessle:*

> Such a determination can be based on objective and verifiable evidence presented to the trial court and must be made on a case-by-case basis. Factors appropriate for consideration by the trial court might include, but are not limited to, the size and structural divisions of the law firm involved, the likelihood of contact between the 'infected' attorney and the specific attorneys responsible for the present representation, the existence of rules which prevent the 'infected' attorney from access to relevant files or other information pertaining to the present litigation or which prevent him from sharing in the fees derived from such litigation.

717 F.2d at 421 (citation omitted).[18]

The Federal Circuit, expressly analyzing and applying the law of the Seventh Circuit on attorney disqualification, rejected precisely the same argument in *Panduit, supra:*

> Nowhere in Seventh Circuit opinions has proof of *formal screening* been delineated as the *sine qua non* of establishing the nonexistence of the presumed fact that confidences have been shared. Within the factual context of *LaSalle Bank,* 703 F.2d at 259, the court merely opined that a *timely* screening arrangement might have prevented disqualification in that case.

\*　　\*　　\*　　\*　　\*　　\*

> A rule that screening is the exclusive means of rebutting the presumption that confidences have been shared, *regardless of independent evidence,* cannot rest on *LaSalle* or *Schiessle.*

744 F.2d at 1580–81 (emphasis in original).

Given that this Court has found as a matter of fact that neither Tenenbaum nor the Alexander firm has received any of Kapco's confidential information from Ms. Wyatt, this Court holds that the absence of formal, institutionalized "Chinese Wall" type mechanisms in the Alexander firm does not require disqualification. Indeed, it is difficult if not impossible to imagine what sort of formal mechanisms could be established to erect the "Chinese Wall" in a firm as small as the Alexander firm that are not already present. Tenenbaum testified that he has instructed everyone in his firm not to discuss Kapco with Ms. Wyatt and that he did so prior to her employment in May, 1985.[19] Ms. Wyatt testified she has discussed Kapco with no one at the Alexander firm; that she has not performed any work on Kapco matters; that she does not work with Tenenbaum or Seeder, his associate; that she has never looked at the Alexander firm's Kapco file; and that she does not even know where it is located.[20] As the court in *Panduit, supra,* 744 F.2d at 1579, stated: "An *absolute* finding of no *possible* inadvertent sharing of confidences is not required to establish an effective rebuttal." (Emphasis in original.) Thus, with Tenenbaum's assurances that he has done all that is necessary to guard against the receipt of Kapco's confidences through Ms. Wyatt,

---

18. In a slight variant of its "Chinese Wall" argument, Kapco asserts that the mere appearance of impropriety mandates disqualification. In *Freeman v. Chicago Musical Instrument Co.,* 689 F.2d 715 (7th Cir.1982), the Seventh Circuit held that the mere appearance of impropriety is insufficient to warrant disqualification: the attorney whose disqualification is sought must actually possess confidential information.

19. Given this testimony, Kapco's assertion that Tenenbaum should have distributed a written memorandum to the employees of his firm instructing them not to discuss Kapco with Ms. Wyatt is without merit. Although such a memorandum would have been a nice formality, it is

hardly necessary, particularly in the context of a small law firm. In fact, Friedman himself did not produce any memorandum to Craig and his employees cautioning them not to discuss client confidences of the Alexander firm with his new secretary from that firm, Ms. Lynn DeHeer.

20. Query whether keeping the Kapco file from Ms. Wyatt is even necessary in light of the fact that the relevant inquiry here is designed to assure that Ms. Wyatt not divulge any of Kapco's confidences to the Alexander firm, not that she be barred from receiving C & O's confidences.

this Court concludes that C & O has clearly and effectively rebutted the presumption of shared confidences with respect to the present relationship between Ms. Wyatt and the Alexander firm.

The Seventh Circuit has repeatedly admonished courts to guard against lightly disqualifying the attorney of a party's choice partly because of the prejudice inevitably resulting from such disqualification. This factor is particularly persuasive here because Tenenbaum has not only been involved in this litigation from its inception at considerable expense to C & O, but he was also personally involved in negotiating the December 20, 1984 settlement agreement, the substance and meaning of which Kapco has now put in issue. As such, Tenenbaum is virtually indispensable to C & O's position in the current litigation. The Seventh Circuit has also cautioned district courts to guard against the increasing use of disqualification motions in the arsenal of litigation tactics. Although this Court recognizes that an employee who has shared a client's confidences should not be able to switch to the opposing camp mid-litigation with impunity, the Court cannot ignore the obvious animus that exists between Friedman and Tenenbaum and between Friedman and Ms. Wyatt.[21] Although Kapco's concerns that its confidences not be disclosed to its opponents are legitimate, this Court will not condone its use of the attorney disqualification tactic as a means of retaliation against an opposing counsel and a former secretary.

*Conclusion*

For the reasons stated above, Kapco's "emergency motion to disqualify and for injunction" is denied. The request of all parties for attorneys' fees and costs incurred in prosecuting and defending against the motion is also denied; each party is to bear its own costs and attorneys' fees.

---

**21.** The series of correspondence between Tenenbaum and Friedman, which is a part of the record in this case, demonstrates the unprofessional level to which their relationship has deteriorated. Viewed in this light, the purported "conspiracy of silence," as Friedman terms it, between Ms. Wyatt and Tenenbaum to keep Friedman from learning her new place of employment prior to her joining the Alexander firm is, however regrettable, nonetheless understandable. Tenenbaum obviously did not phone Friedman to let him know that Ms. Wyatt was joining his firm as a secretary because he was not speaking to him at all at that point.