## MMR/WALLACE POWER & INDUSTRIAL, INC.

v.

## THAMES ASSOCIATES, et al.

### Civ. No. H–89–75 (EBB).

United States District Court,
D. Connecticut.

Feb. 15, 1991.

David E. Rosengren, Kevin W. Gillen, Pepe & Hazard, Hartford, Conn., for MMR/Wallace.

E. Alan Arnold, Patrick A. Thompson, Luther P. House, Jr., David A. Dial, Smith, Currie & Hancock, Atlanta, Ga., William P. Frank, pro hac vice, Christopher R. Gette, Skadden, Arps, Slate, Meagher & Flom, New York City, for Combustion Engineering.

Roger J. Fleischmann, Adrian G. Driscoll, Fleischmann & Fleischmann, San Francisco, Cal., pro hac vice, for defendant Toshiba Intern. Corp.

Carol K. Young, Douglas B. Thayer, Leonard Bieringer, Ann M. Siczewicz, Schatz & Schatz, Ribicoff & Kotkin, Kimberly A. Knox, William R. Moller, Moller, Horton & Fineberg, P.C., Hartford, Conn., for Thames Associates.

John C. Yavis, Jr., Murtha, Cullina, Richter & Pinney, Hartford, Conn., for AES Thames, Inc.

Robert N. Chatigny, Hartford, Conn., for third party defendant Combustion Engineering.

Peter R. Huntsman, Updike, Kelly & Spellacy, P.C., Hartford, Conn., for Toshiba Intern. Corp.

## RULING ON PLAINTIFF'S MOTION TO DISQUALIFY COUNSEL

ELLEN B. BURNS, Chief Judge.

Plaintiff, MMR/Wallace, ("MMR"), commenced the underlying lawsuit on February 8, 1989 alleging, *inter alia*, that defendant, Thames Associates, ("Thames"), had breached the terms of its construction contract with plaintiff. MMR has now moved to disqualify Thames' counsel Matthew Forstadt and the firm, Schatz & Schatz, Ribicoff & Kotkin, (the "Schatz firm"), on the grounds that Forstadt made unauthorized *ex parte* contact with Richard Willett, a "confidential former employee" of MMR and an "irreplaceable member of MMR's litigation team," in violation of the Connecticut Rules of Professional Conduct. Thames opposes the motion, arguing that no violation of the Rules occurred, and that even if Forstadt's conduct was inappropriate, disqualification is unwarranted absent a showing that protected confidential information was actually communicated to the defendant thereby giving it an unfair advantage at trial.

For the reasons stated below, plaintiff's motion to disqualify attorney Forstadt and the Schatz firm is granted.

*Background*

MMR entered into a construction contract with Thames Associates on May 31, 1988 in which it agreed to perform mechanical construction work on a cogeneration plant being built by Thames in Uncasville, Connecticut. Among the staff employed by MMR at the Uncasville project site was Richard Willett, who served as MMR's of-

fice manager from December, 1987 until February, 1989. Deposition of Richard Willett, August 27, 1990, at 87, 90. (hereafter "Willett deposition"). As office manager, Willett was responsible for record keeping, purchasing, handling most of the correspondence concerning the project, and supervising other clerks employed in the office. Willett deposition at 51. In his position, Willett gained "firsthand information" regarding the project's daily operations. *Id.* at 92.

On February 8, 1989, Thames terminated MMR's contract prompting the underlying lawsuit. Subsequent to its termination, MMR established an office in Norwich, Connecticut for the purpose of closing out the project-related activities and to prepare for litigation. Affidavit of Mark H. Allen, MMR Executive Vice President, ¶ 4–9. MMR retained the Atlanta law firm of Smith, Currie & Hancock, ("Smith & Currie"), to represent it. Richard Willett was reassigned by MMR to its Norwich office, where he was employed until December, 1989. During this period, Willett assisted the plaintiff's attorneys David Dial, John Doggett and Pat Thompson in their preparation of this litigation in several ways. Willett was responsible for setting up plaintiff's document control system to organize the thousands of documents obtained by MMR during discovery. As part of his job, Willett was responsible for reviewing, indexing and digesting all of the various discovery materials. Willett deposition at 40–43, 153–155. On at least two occasions, Willett accompanied MMR's counsel to the locations where the requested documents were stored, and worked with them in deciding which documents to copy. *Id.* at 43. On at least one occasion, Willett met with the attorneys from the Schatz firm when they came to MMR's office to review documents.[1] *Id.* at 45. He prepared a number of reports and analyses, both at the request of Smith & Currie and upon his own initiative, concerning issues involved in the litigation. *Id.* at 36–39.

---

1. Attorney Forstadt was not present at this meeting. *Id.* at 45. However, Forstadt was present at a meeting held on February 7, 1989 at which Willett represented MMR as its designated representative to discuss closing out MMR's participation in the project. *Id.* at 34–35.

Willett also attended and participated in a number of confidential meetings with plaintiff's counsel to discuss litigation tactics and strategies, *Id.* at 44–45, 182–183, and assisted counsel in answering interrogatories.[2] *Id* at 39. He also consulted with plaintiff's counsel regarding the people who were going to be deposed, including possible topics about which to speak with them. *Id.* at 47–48. Throughout this period, Willett served as an on-site observer for MMR at counsel's request. *Id* at 46. Despite being reassigned to a project in Greenville, North Carolina in December 1989, Willett maintained weekly contact with Smith & Currie until June of 1990, *Id.* at 48–50, 180, although most of his discussions with counsel after he left Connecticut pertained to MMR's financial situation. *Id.* at 49.

In approximately March of 1990, Willett began discussing with attorneys at Smith & Currie the possibility of his continuing to serve as a consultant for MMR after MMR declared bankruptcy.[3] *Id.* at 49. Sometime in June, Aetna made Willett an offer to work as a litigation consultant. Dissatisfied with the offer, Willett made a counteroffer which was neither accepted nor rejected by Aetna. *Id.* at 66, 161–62. Construing his inability to get a firm commitment from Aetna as an indication that it was not interested in hiring him, and apparently upset at having not been paid nearly $14,000 owed him by MMR, *Id.* at 64–67, Willett asked a friend to anonymously contact defendant's attorney Matthew For-stadt and, without identifying Willett, see if Forstadt would be interested in speaking with him about the possibility of his becoming a trial consultant for Thames. *Id.* at 53–55. Upon hearing that Forstadt would, in fact, be interested in interviewing him about his knowledge of the project, and being informed by Forstadt that there was nothing illegal in his doing so, Willett agreed to meet with Forstadt. The two spoke by telephone a number of times prior to their rendezvous in order to set up a mutually agreeable time and place to conduct their meeting. The meeting, which was attended by Willett, Forstadt and Richard Sieracki, a technical consultant for Thames, took place in Tampa, Florida on June 19, 1990 and lasted approximately two to four hours.[1] *Id.* at 59–60.

During the interview, Forstadt asked Willett if he was under contract to MMR, or whether he had an existing or previous employment agreement with MMR, to which Willett responded that he did not. Willett deposition at 173–74. Forstadt also instructed Willett that, if he was privy to privileged communications with plaintiff's counsel, Forstadt did not want to know what was discussed,[5] *Id.* at 60, 165–167, nor was he interested in any proprietary or trade secret information belonging to MMR. Forstadt further instructed Willett to make duplicate copies of certain computer discs containing various reports, analyses and correspondence regarding the Uncasville site, and then to return the original discs to Smith & Currie. *Id.* at 165–166.

---

**2.** Willett was listed by MMR in an answer to an interrogatory as someone who had assisted in the preparation of the plaintiff's responses. He was also listed by MMR in its response to a Thames interrogatory as a "fact witness" who might also render expert opinion testimony.

**3.** On March 26, 1990, MMR filed a petition in the bankruptcy court under Chapter 11. Willett's employment with MMR was officially terminated as of that date. Sometime thereafter, MMR's surety, The Aetna Casualty & Surety Company, ("Aetna"), took over the financing and direction of the instant litigation, whereupon it commenced negotiations with Willett to retain him as a litigation consultant. Although Willett appears to have been offered a position with Aetna to continue consulting on the litigation, the offer was never formally accepted.

Nor did Willett ever receive or accept an offer of employment to perform litigation support services directly for Smith & Currie. Willett deposition, *supra,* at 49–51, 160–62.

**4.** Forstadt contends that he was unaware at the time of the interview that Willett had performed any work for plaintiff's attorneys or was important to the preparation of their case in any way other than as a fact witness. Affidavit of Matthew Forstadt, dated December 4, 1990 at ¶ 8. However, he was aware Willett had a role in the preparation of the litigation at the time the agreement was reached. *See, infra,* at n. 6.

**5.** Willett stated at his deposition that, as a lay person, he did not know what information or communications are protected by the attorney/client privilege. *Id.* at 60–61.

On June 26, 1990, Forstadt extended an offer to hire Willett as an exclusive trial consultant for Thames Associates for the minimum guaranteed sum of $15,000. *Id.* at 64–66. The terms of the agreement were memorialized in a four-page letter sent by Forstadt to Willett on that date.[6] By chance, prior to executing the proposed consulting agreement, Willett received a telephone call from attorney John Doggett, an associate at Smith & Currie, who was calling to inquire whether Willett had reached an agreement with Aetna to continue to assist with plaintiff's trial preparation. *Id.* at 67–68. Willett informed Doggett that he had "cut a deal" to serve as a consultant for Thames, and that under instructions he had received from Forstadt, he would no longer be communicating with attorneys from Smith & Currie. *Id.* at 68–69. Immediately upon being informed of Willett's intentions, Smith & Currie attorney David Dial contacted Willett, in-

---

**6.** The letter states, in relevant part:

Dear Dick:

This letter will confirm the conditions and circumstances under which Thames Associates ("Thames") has agreed to employ you as an independent consultant with respect to the above captioned litigation.

In making the determination to offer you a consulting position we have relied upon your advice that: (i) although you are a former employee of MMR/Wallace Power & Industrial, Inc. ("MMR"), you presently have no employment or other relationship with MMR; (II) you did not and do not have any contractual restrictions with MMR or anyone else that would preclude you from entering into this consulting agreement with Thames; (III) you are not in possession of any trade secret or proprietary information of MMR or others; and (iv) you have not and will not enter into any consulting agreement with any other entity concerning any aspect of the aforementioned litigation.

You have advised me that you have in your possession certain computer disks representing the. job history, costs and certain of the correspondence concerning MMR's work on the Thames CFB project in Uncasville, Connecticut. You have further indicated that Aetna has demanded the return of those disks from you. I have advised you to return the original of those disks to Aetna; but in order to assure reproduction capability at a later date in the litigation process, you have made a duplicate copy of those disks....

It is our understanding that you have rendered assistance to attorneys for Aetna in their preparation of litigation. It is important to note that conversations which you have had with those attorneys might in some instances be subject to an attorney/client privilege. We will not ask you to recount for the benefit of Thames any such conversations. However, some of the conversations which we will have with you may concern the same subject matters as your conversations with MMR's counsel. You must differentiate (i) between factual developments and your opinions with respect to such factual developments, and (i) [sic] the substance of your conversations with MMR's counsel. We shall not ask you to disclose the latter.

It is also important to define the scope of services which you will be providing pursuant to this modified exclusive consulting agreement. The fees that you are being paid pursuant to this agreement are for assistance which you will provide, upon request, with respect to the development of the facts and circumstances preceding the commencement of the above captioned litigation. We cannot and will not pay you if you have to testify as a fact witness ... Obviously, it is appropriate and for the most part necessary to compensate expert witnesses. At the present time, it is premature to determine whether you will be called upon to testify as an expert witness or even a fact witness. If you are called upon to testify, your prior relationship with MMR and the fact that you have provided services to Thames Associates pursuant to this consulting agreement are legitimate subjects of inquiry by the questioner.

Your services to Thames Associates pursuant to this consulting agreement will preclude you from providing any services to MMR or any other litigant with respect to the subject matter of this litigation ... Nor does this consulting agreement preclude you from working for other contractors or in other fields as long as such other employment is unrelated to the facts and circumstances of this litigation and does not impair your ability to provide services hereunder.

Consulting services proved by you pursuant to this agreement shall be subject to my direct control and supervision or to the control and supervision of those persons designated by me ...

... As a consultant to and for Thames Associates, you are not to have any conversations with MMR and/or Aetna's counsel or persons working with or for them or representatives of MMR or Aetna without specific further authorization from me.

For services to be performed pursuant to this agreement, you shall be paid an initial retainer of $5,000 against an hourly rate of $45. As a part of this agreement, Thames Associates is agreeing to provide you with a minimum guaranteed consulting fee of $15,000 against the hourly rate set forth above and you are agreeing to provide Thames Associates not less than 333 hours of services. Submitted along with this agreement is the initial payment of $5,000 which shall be deemed to be acknowledged and received by your signature hereon.

formed him that his agreement with Thames was improper and urged him not to sign it. *Id.* at 71. Willett communicated Dial's warnings to Forstadt, who informed Willett that he had nothing to worry about, and that he should sign the agreement. *Id.* Dial also telephoned Forstadt to protest the transaction.[7] Notwithstanding attorney Dial's protests, Willett executed the Thames consulting agreement on June 27, 1990.

On July 2, 1990, MMR filed an application for a temporary restraining order and preliminary and permanent injunction to prohibit any further communications between Willett and attorney Forstadt. Plaintiff's request was rendered moot when, on July 9, 1990, Senior United States District Judge Robert Zampano, to whom the case had been referred for the purpose of conducting settlement negotiations, issued a memorandum indicating that, pursuant to an agreement of the parties, "the defendants and their counsel will have no contact with Richard Willett, except for information notices, copies of which shall be furnished to plaintiff's counsel ... [P]articipation in the settlement conference shall not affect the parties' rights to file any and all motions, including motions for sanctions, if the settlement conferences are unsuccessful." Judge Zampano's efforts to mediate a settlement of this suit were unsuccessful. Willett's deposition was taken on August 27 and 28, 1990 in order to ascertain his relationship with MMR and its counsel upon the termination of its contract with Thames Associates. During the course of Willett's deposition, plaintiff's counsel orally sought a protective order from this court prohibiting any substantive discovery of Mr. Willett. The motion was denied without prejudice to MMR's counsel to file whatever motion for sanctions and/or for the preclusion of testimony they considered appropriate upon the completion of Willett's deposition. Although the deposition was allowed to proceed, counsel were prohibited from inquiring into facts or opinions acquired by Willett as a consultant to the MMR/Wallace litigation team. The instant motion for disqualification of counsel was filed on October 12, 1990. Oral argument was held on the motion on January 24, 1991, and the motion is now ready for decision.

*Discussion*

█ Federal courts have inherent authority to discipline attorneys who appear before them for conduct deemed inconsistent with ethical standards imposed by the court. *In re Snyder*, 472 U.S. 634, 645 n. 6, 105 S.Ct. 2874, 2881 n. 6, 86 L.Ed.2d 504 (1985); *Board of Education of the City of New York v. Nyquist*, 590 F.2d 1241 (2nd Cir.1979) (Federal court has power to disqualify attorneys in litigation pending before them where necessary to preserve the adversary process); *Hull v. Celanese Corporation*, 513 F.2d 568 (2nd Cir.1975) (District Court bears responsibility for the supervision of the members of its bar). This court has exercised its authority by adopting the Rules of Professional Conduct, ("Rules"), as approved by the Judges of

---

**7.** Dial's objections to Forstadt's *ex parte* contact with Willett were memorialized in a June 27, 1990 letter telecopied from attorney Doggett to Forstadt, which provides, in relevant part:

Dear Matt:

It has come to our attention that either you, Thames Associates, Black & Veatch, or someone working under your direction is attempting to contract with Dick Willett as a consultant/advisor for this litigation. Mr. Willett was employed by MMR/Wallace following its termination from the Thames project to provide assistance to its attorneys in preparation for this litigation. In so doing, Mr. Willett is privy to extensive work product and attorney-client communications relative to this litigation.

Any attempts to hire Mr. Willett or, for that matter, make ex parte contacts with him, are a breach of the duties and obligations imposed upon opposing parties by the ethical standards of adversarial engagement.

We strenuously object to any ex parte contacts with Mr. Willett by anyone representing the interests of parties adverse to MMR/Wallace in this litigation.

If you do not confirm that our information regarding the ex parte contacts and proposed contract with Mr. Willett is erroneous within twenty-four (24) hours, we will notify Judge Zampano of this development and take whatever action is necessary to obtain redress. We believe such conduct seriously jeopardizes the upcoming mediation proceedings, and for this reason, have forwarded a copy of this letter to all parties involved in this litigation.

the Connecticut Superior Court as in effect on October 1, 1986, as the standard of professional conduct expected of lawyers practicing in the District of Connecticut. *See* Local Rules of Civil Procedure 3(a)(1).[8] Pursuant to the Rules, the court may, in appropriate circumstances, impose sanctions upon an attorney whose conduct contravenes the governing ethical standards. The role of the district court in enforcing the Rules is a limited one, however, and unless an attorney's questionable conduct threatens to taint the litigation pending before the court, "the business of the court is to dispose of litigation and not to act as a general overseer of the ethics of those who practice here." *United States v. Dennis*, 843 F.2d 652, 657 (2nd Cir.1988) (quoting *W.T. Grant Co. v. Haines*, 531 F.2d 671, 677 (2nd Cir.1976)); *Cf. Armstrong v. McAlpin*, 625 F.2d 433, 444 (2nd Cir.1980) (en banc), *vacated on other grounds and remanded*, 449 U.S. 1106, 101 S.Ct. 911, 66 L.Ed.2d 835 (1981) ("Absent a threat of taint to the trial, we continue to believe that possible ethical conflicts surfacing during the litigation are generally better addressed by the comprehensive machinery of the state and federal bar").

Where the proposed sanction is the disqualification of counsel, the court must be especially cautious, notwithstanding any misgivings it may have regarding an attorney's ethical conduct, both because of the immediate effect disqualification has on a client by separating him from his counsel of choice, and because such motions are often interposed for tactical reasons. *Nyquist, supra*, 590 F.2d at 1246. Accordingly, courts should hesitate to impose so drastic a measure as disqualification except when absolutely necessary.

*Freeman v. Chicago Musical Instrument Co.*, 689 F.2d 715, 721 (7th Cir.1982). Nevertheless, if the court concludes that the asserted course of conduct by counsel threatens to affect the integrity of the adversarial process, it should take appropriate measures, including disqualification, to eliminate such taint. *Papanicolaou v. Chase Manhattan Bank, N.A.*, 720 F.Supp. 1080, 1083 (S.D.N.Y.1989). Even an appearance of impropriety may, under the appropriate circumstances, require prompt remedial action by the court.[9] *Emle Industries, Inc. v. Patentex, Inc.*, 478 F.2d 562, 565 (2nd Cir.1973). In assessing the possibility that the trial may be prejudiced by an attorney's unethical conduct, the district court must bear in mind the fact that:

> The preservation of public trust both in the scrupulous administration of justice and in the integrity of the bar is paramount. Recognizably important [is defendant's] right to counsel of [its] choice...T[his] consideration must yield, however, to considerations of ethics which run to the very integrity of our judicial process.

*Hull, supra*, 513 F.2d at 572. Accordingly, "any doubt is to be resolved in favor of disqualification." *Id.* at 571.

There can be no doubt that the spirit of the ethical norms adhered to in this district, if not the letter of the Rules of Professional Conduct themselves, precludes an attorney from acquiring, inadvertently or otherwise, confidential or privileged information about his adversary's litigation strategy. *See* Rule 1.6 (Fundamental to the client-lawyer relationship is the lawyer's duty not to reveal the confidences of his client, a corollary of which is the duty not to seek to cause another person to

---

8. As is noted in the preface to the Rules, "[t]hese rules do not ... exhaust the moral and ethical considerations that should inform and guide a lawyer, but simply provide a framework for the ethical practice of law." Rules of Professional Conduct, *supra*, at 1.

9. That a lawyer is ethically obligated to avoid "even the appearance of impropriety" is embodied in Canon 9 of the Code of Professional Responsibility, ("Code"). Although the Code has not been formally adopted in Connecticut, "its salutary provisions have consistently been relied upon by the courts in [the Second Circuit] in evaluating the ethical conduct of attorneys." *Hull, supra*, 513 F.2d at 571, n. 12, albeit only in the "rarest cases." *Nyquist, supra*, 590 F.2d at 1247. The court notes that, prior to its adoption of the Rules, this court recognized the Code of Professional Responsibility of the American Bar Association as expressing the standards of professional conduct expected of lawyers. *See e.g.* Rule 3(a), Local Rules of Civil Procedure. (as in effect May 1, 1985).

do the same); Rule 4.2 (Duty of an attorney not to communicate about the subject of the representation with a party the lawyer knows to be represented by counsel for fear that lawyer's tactics will be revealed and the representation will suffer as a result); Rule 8.4 (Professional misconduct for a lawyer to engage in conduct that is prejudicial to the administration of justice). That the court has an obligation "to enforce the lawyer's duty to absolute fidelity and to guard against the danger of inadvertent use of confidential information" pertaining to his adversary's trial preparation and tactics, *Hull, supra,* 513 F.2d at 571 (quoting *Ceramco Inc., v. Lee Pharmaceuticals,* 510 F.2d 268, 271 (2nd Cir.1975)), is, upon review of the case law in this area, unmistakably clear.

In *Emle Industries, supra,* the Second Circuit addressed the issue of an attorney's use of confidential information obtained directly as a result of his having previously represented his current adversary. The *Emle Industries* court upheld the disqualification of plaintiff's counsel, David Rabin, who "switched sides" after having previously represented Burlington Industries, the parent company of the defendant, Patentex Inc., in a lawsuit involving a "substantially related" claim. Relying extensively on *T.C. Theatre Corp. v. Warner Brothers Pictures,* 113 F.Supp. 265 (S.D.N.Y.1953), *reargument denied,* 125 F.Supp. 233 (S.D.N.Y.1953), the *Emle Industries* court noted that an attorney may not represent a client in an action substantially related to matters wherein the attorney had previously acted on behalf of his present adversary. The court further indicated that, in such cases, it would be appropriate to assume that during the course of the former representation, confidences were disclosed bearing on the subject matter of the representation. Because "[e]ven the most rigorous self-discipline might not prevent a lawyer from unconsciously using or manipulating a confidence acquired in an earlier representation and transforming it into a telling advantage in the subsequent litigation," *Id.* at 571, "the court need not, indeed cannot, inquire whether the lawyer did, *in fact,* receive confidential information during his previous employment which might be used to the client's disadvantage." *Id.* Relying on Cannon 9, the *Emle Industries* court concluded that "where it can be reasonably said that in the course of the former representation the attorney *might* have acquired information related to the subject matter of his subsequent representation, it is the court's duty to order the attorney disqualified." *Id.*

In *Laskey Brothers of West Virginia v. Warner Brothers Pictures,* 224 F.2d 824 (2nd Cir.1955), *cert. denied,* 350 U.S. 932, 76 S.Ct. 300, 100 L.Ed. 814 (1956) and *Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp.,* 518 F.2d 751 (2nd Cir.1975), the Second Circuit addressed the question of whether a presumption arises that an attorney comes into possession of confidential information about a client as a result of his prior professional association with another attorney who represented the client, thereby necessitating the disqualification of the attorney from representing the client's adversary in subsequent litigation. In *Laskey Brothers,* the court considered defendant's motion to disqualify plaintiff's counsel in an antitrust action. The grounds for the motion were that plaintiff's attorney, Arnold Malkan, had at one time been a partner of attorney David Isacson, who was disqualified from representing the plaintiffs because of confidential information he obtained during his representation of the defendant in a prior antitrust action. The *Laskey Brothers* court found that "within the framework of the original [Malkan & Isacson] partnership the fact of access to confidential information through the person of the partner with such specialized knowledge is sufficient to bar the other partners, whether or not they actually profit from such access." *Id.* at 827. "Once the partnership is dissolved, however, the inference from access to receipt of information, in a new case having no relationship to the old partnership, becomes logically less compelling and should therefore become rebuttable legally ..." *Id.* Concluding that attorney Malkan had successfully rebutted the presumption of

shared confidences,[10] the court affirmed the trial court's denial of defendant's disqualification motion.

■ In *Silver Chrysler*, the Second Circuit considered whether a former associate at a law firm may be presumed to have acquired confidential information about one of the firm's clients by virtue of his previous association with the firm. At issue was a motion brought by defendant, Chrysler Motors Corporation, to disqualify plaintiff's counsel, the law firm of Hammond & Schreiber, because attorney Dale Schreiber had at one time been employed as an associate by defense counsel, the firm of Kelley Drye Warren Clark Carr & Ellis. Concerned over the possibility of unnecessarily constricting the careers of attorneys who start their practice of law with large law firms simply because of their former associates, *Id.* at 754, the *Silver Chrysler* court upheld the trial court's determination that the disqualification of Hammond & Schreiber was not warranted merely because attorney Schreiber had once briefly worked for Kelly Drye. The court noted that "it would be absurd to conclude that immediately upon their entry on duty [legal associates] become the recipients of knowledge as to the names of all the firm's clients, the contents of all files relating to such clients, and all confidential disclosures by client officers or employees to any lawyer in the firm." *Id.* at 753–54. "[W]hile ... an inference may arise that an attorney formerly associated with a firm himself received confidential information transmitted by a client to the firm, that inference is a rebuttable one." *Id.* at 754.[11]

In *Hull v. Celanese Corporation, supra, Goldenberg v. Corporate Air, Inc.,* 189 Conn. 504, 457 A.2d 296 (1983), *rev'd on other grounds Burger and Burger, Inc. v. Murren,* 202 Conn. 660, 522 A.2d 812 (1987)[12]; *Williams v. Trans World Airlines, Inc.,* 588 F.Supp. 1037 (W.D.Mo. 1984), and *Kapco Manufacturing Co. v. C & O Enterprises, Inc.,* 637 F.Supp. 1231 (N.D.Ill.1985), various courts considered the question of whether an attorney or non-attorney who obtains confidential information about a party to a lawsuit as a result of his participation in the representation or pretrial preparation of that party may be presumed to have disclosed the information to counsel for that party's adversary in the litigation when the individual switched sides in the same litigation. In *Hull v. Celanese Corporation, supra,* the court considered whether disqualification was warranted in a sex discrimination case brought by two former Celanese employees when plaintiffs' counsel, the law firm of Rabinowitz Boudin & Standard, agreed to represent Donata Delulio, a former in-house counsel at Celanese, who after being discharged from her employment with the company, sought to intervene as a plaintiff in the litigation. The defendant argued that confidential information received by Delulio as Celanese's attorney might be used by the Rabinowitz firm against it in the prosecution of the underlying action.[13]

---

**10.** The *Laskey Brothers* court noted that "[i]t will not do to make the presumption of confidential information rebuttable and then to make the standard of proof for rebuttal unattainably high. This is particularly true where, as here, the attorney must prove a negative, which is always a difficult burden to meet." *Id.* at 827.

**11.** Defendant erroneously relies on *Laskey* and *Silver Chrysler* for the proposition that the presumption that attorney Forstadt received confidential information from Willett is legally rebuttable. Even if a presumption of shared confidences is rebuttable, *see infra* at pp. 726–27, in view of the fact that the career mobility issues which concerned the *Laskey* and *Silver Chrysler* courts are not present here, the lenient standard of proof required by those courts to rebut the inference that an attorney who left a law firm *possessed* confidential information about the firm's clients is not the appropriate standard to be applied where the possessor of such information is alleged to have *actually disclosed* it to an adversary.

**12.** In *Burger and Burger,* the Connecticut Supreme Court held that disqualification orders in civil cases do not constitute appealable final judgments, thereby overruling *Goldenberg* to the extent that that court's interlocutory consideration of a disqualification order was inconsistent with the court's more recent position.

**13.** After reviewing affidavits submitted by Delulio and the Rabinowitz firm in support of her motion to intervene, the trial court judge was convinced "of the possibility that Delulio, un-

The court rejected as "overlook[ing] the spirit of Cannon 9" the Rabinowitz firm's argument that, because it had never worked for Celanese and because it had carefully cautioned Delulio not to reveal any information received in confidence as Celanese's attorney, it could not have received or used, consciously or unconsciously, any confidential information. The *Hull* court concluded that, given the mere opportunity for disclosure of confidential information by Delulio, disqualification of the Rabinowitz firm was required.

In *Goldenberg, supra,* the issue was whether defense counsel should be disqualified for having consulted with an attorney who had changed sides during the pendency of the litigation. The case arose in the context of a tragic airplane crash, in which the plaintiff sought damages from defendants Corporate Air, Inc., ("Corporate Air"), the operator of the aircraft, and Avco Corporation, ("Avco"), the manufacturer of the plane's engines. Avco was originally represented in the law suit by attorney Joseph Flaherty, staff counsel for Avco's insurer, the U.S. Aviation Insurance Group, ("USAIG"). Flaherty subsequently left USAIG to join McBreen & Co., an accident investigation and insurance adjusting firm which insured Corporate Air in regard to the accident. Corporate Air was represented by attorney William Moller. After Flaherty had joined McBreen & Co., Moller consulted with him regarding the accident. Although the *Goldenberg* court concluded that there was no evidence that Moller knew of Flaherty's past relationship with Avco, or that he acted improperly in

any way, *Id.* 189 Conn. at 507, 457 A.2d 296, the court upheld the trial court's decision to grant Avco's motion to disqualify Moller from representing Corporate Air. The court found that Flaherty possessed confidential information regarding Avco's trial plan and defense strategy, and therefore that Moller, as a result of his conversations with Flaherty, was in a position to receive confidences concerning Avco. The *Goldenberg* court concluded that this possibility alone was sufficient to disqualify Moller. *Id.* at 512–13, 457 A.2d 296.

*Williams v. Trans World Airlines, Inc.,* 588 F.Supp. 1037 (W.D.Mo.1984), involved a situation in which Audrey Campbell Schanck, a trial assistant who had helped prepare TWA's defense to an age discrimination suit brought by plaintiffs, two former TWA employees who had been furloughed by the company, sought to retain plaintiffs' counsel to represent her in an age discrimination suit against TWA after she was herself furloughed. Although not an attorney,[14] Schanck assisted TWA's investigation of the plaintiffs' charges, and after litigation was commenced, prepared a report about their claims at the request of defense counsel. As a trial assistant, Schanck was also privy to internal TWA documents regarding its furlough policies. In moving to disqualify plaintiffs' counsel in the *Williams* case, the law firm of Linde, Thomson, Fairchild, Langworthy, Kohn, and Van Dyke, TWA contended that plaintiffs had gained an unfair advantage because of counsel's access to confidential and privileged information through its rep-

questionably possessed ... information, within the attorney-client privilege, [and] did in fact transmit some of it to the Rabinowitz firm, consciously or unconsciously." *Id.* at 570. The trial judge considered conducting an evidentiary hearing to determine whether there had been any actual disclosures, but refrained from doing so because it would have necessitated revealing to the Rabinowitz firm in some specificity the extent of Celanese's disclosures to Delulio in order to ascertain to what extent, if any, the information had reached plaintiff's counsel. *Id.* at 570, n. 8.

**14.** The *Williams* court dismissed the notion that because Schanck was not an attorney, the risk

of disclosure of confidential information was somehow reduced. The court stated:

> The fact that Campbell Schanck is not an attorney does not make it less likely that she would reveal confidential information to the attorney representing her in a lawsuit against her former employer. In fact, a persuasive argument can be made that a non-lawyer would be more likely to reveal confidential information. Presumably, an attorney would be acutely aware of his or her ethical obligation not to reveal confidences of a former client. A non-lawyer might not be as sensitive to the need to safeguard the confidences of his or her previous employer gained while working with an attorney.

resentation of Schanck. The *Williams* court agreed, noting that "the potential for unfair discovery of information through private consultation rather than through normal discovery procedures threatens the integrity of the trial process." *Id.* at 1045.[15] Although expressing its "considerable reluctance" to disqualify counsel, *Id.* at 1046, the court concluded that disqualification was warranted in view of the fact that:

> TWA's efforts to block the direct use at trial of confidential information obtained from Campbell Schanck would not erase the threat to the integrity of the trial process. A reasonable member of the public or of the bar would share with TWA the nagging suspicion that plaintiffs' trial preparation and presentation of their cases had benefitted from confidential information obtained from Campbell Schanck. All further proceedings in this case, including any trial, would be tainted by this reasonable suspicion.

*Id.* at 1045.

In *Kapco, supra,* plaintiff sought to disqualify defense counsel after they hired Patricia Wyatt, who had served as a secretary and office manager for plaintiff's counsel Eugene Friedman throughout much of the litigation. In denying the plaintiff's motion, the *Kapco* court determined that, although Wyatt was a "key employee who had access to and admittedly received confidential client communications from a two-lawyer law firm [who] left to become the secretary to a partner of the opposing law firm ... in the heat of litigation," *Id.* at 1236, the defendant "clearly and effectively rebutted the presumption of shared confidences with respect to the present relationship between Ms. Wyatt and the [defendant's] firm." *Id.* at 1238–39 (citing *Schiessle v. Stephens,* 717 F.2d 417 (7th Cir.1983))

Finally, in *MGM Grand Hotel–Las Vegas, Inc. v. American Protection Insurance Company,* CV–LV–82–26 (HDM), 1986 WL 57464 (D.Nev. March 13, 1986),[16] a case remarkably similar to the case at bar, the Nevada district court disqualified counsel for the defendant Insurance Company of North America, ("INA"), Stephen Cozen, after determining that he had engaged in *ex parte* negotiations with George Morris, "a trusted MGM advisor and an important member of its litigation team." *Id.* at 4. Morris had been the project manager for the reconstruction of the MGM Grand Hotel which, in 1980, had been destroyed by fire. He was subsequently promoted to the position of Vice President for Construction with MGM. In the latter capacity, Morris monitored and accounted for the expenses of reconstruction. Morris was also advised of confidential matters regarding the pending litigation, with regard to which Morris provided "indispensable" assistance.[17] MGM also designated Morris as its "sole testifying trial expert

---

*Williams, supra,* 588 F.Supp. at 1043.

**15.** The *Williams* court's presumption that confidences had been imparted by Campbell Schanck to the Linde, Thomson firm was supported by evidence in the record, specifically a letter written by Schanck's attorney to defense counsel in which he called attention to his recent acquisition of information regarding TWA's reduction in work force in the department in which plaintiffs had worked, and to personnel changes in the department after the furlough, the source of which was Campbell Schanck. *Id.* at 1043.

**16.** The plaintiff's motion for disqualification in the case had previously been granted by the Nevada district court on the grounds that Cozen's conduct in negotiating with a fiduciary of a corporate adversary who possessed confidential information had been improper. The disqualification was affirmed by the Ninth Circuit, *See American Protection Insurance Co. v. MGM Grand Hotel–Las Vegas Inc.,* Civil. No. 83–2674 (9th Cir. December 3, 1984), but the appellate court later withdrew its opinion for lack of jurisdiction. The parties then moved for the district court to reconsider its earlier ruling. The matter was referred to a Magistrate, who, looking to the Ninth Circuit's decision for guidance, issued a recommendation that the motion for reconsideration be denied. The district court accepted the Magistrate's recommendation. Although the Ninth Circuit's withdrawn opinion in *MGM* is unavailable to this court as precedent in consideration of the instant motion for disqualification, the court knows of no reason why the Nevada district court's subsequent unpublished opinion, cited herein, should similarly be considered off-limits.

**17.** Morris involvement with the litigation included consulting with MGM's attorneys on the facts of the case, organizing exhibits, assisting in the drafting of interrogatories, and helping counsel during depositions.

and as a non-testifying consultant." *Id.* at 3. Morris subsequently resigned as Vice President, and entered into a consulting agreement with MGM whereby he was to continue to supervise construction of the hotel and assist plaintiff with its trial preparation. After serving in this latter capacity for approximately one year, Morris had his private attorney contact attorney Cozen to inquire if the defendant would be interested in hiring him as a trial consultant for INA. Cozen negotiated for Morris's services despite knowing of his association with MGM. In granting plaintiff's motion to disqualify attorney Cozen, the *MGM* court concluded:

> The defection of Mr. Morris figures to compromise the chances for success of MGM in this action as much or more than could be effected by any other single person. One can only imagine the consternation of the MGM principals when they learned that he was trying to negotiate a deal with INA. Even protestations that Mr. Morris would divulge only facts to INA, and not theories or strategies of litigation or communications from employees of MGM to its attorneys, would not assuage the fears of any reasonable person that forbidden matters would be discussed. Even if [Morris' private attorney] were present at every conversation between INA representatives and Mr. Morris, there could be no assurance that Mr. Morris wouldn't reveal something he should not. After the revelation had been made, it would be too late. [Morris' attorney] did not represent the interests of MGM. If he had, there would have been no ex parte communication between Mr. Cozen and Mr. Morris in the first place.
>
> The fact that Mr. Morris initiated the ex parte contacts does not save Mr. Cozen ... The question here is not who was most at fault ... but, rather, was it clearly improper for Mr. Cozen to maintain the contacts with Mr. Morris under the circumstances? Nor does the circumstance that Mr. Morris was technical-

ly an ex-employee of MGM when the contacts were first made offer any support to attorney Cozen's position ... Mr. Cozen was facilitating Mr. Morris' scheme to collect a bonanza for being disloyal to his former employer (and then present contractee). The impropriety of attorney Cozen's participation in the nefarious transaction was manifest.

> Mr. Cozen's impropriety affects both the public's view of the judicial system and the integrity of the court. The court provides the forum for legal disputes to be settled fairly and in accordance with impartial rules of procedure. Were the most important witness' assistance in the litigation to be sold to the highest bidder, the court's integrity would be discredited. In addition, the public estimation of the judicial system would be diminished.
>
> The improper contacts already will affect the trial of this matter, if only because Mr. Morris' usefulness as a witness has been seriously eroded. Even more important, MGM has been effectively deprived of the benefits of his unique combination of expertise and factual knowledge in the preparation and presentation of its case. It would be out of the question for MGM to repose confidence in Mr. Morris after his contacts with INA's attorney. Further, it would not be surprising if MGM were to change its trial strategy because of a well-founded fear that Mr. Morris did divulge to attorney Cozen the trial plan that existed at the time of Morris' defection. To the extent that any information wrongfully obtained by Mr. Cozen from Mr. Morris has not yet been disclosed to INA, attorney Cozen's disqualification will serve to mitigate the adverse results of the improper contacts. This, alone, outweighs INA's interest in being represented by counsel of its own first choice.[18]

*Id.* at 14–16.

██ In the present case, MMR alleges that Thames' attorney Matthew Forstadt

---

**18.** Thames' effort to distinguish *MGM* is unpersuasive. Willett, like Morris, possessed an extensive factual knowledge about the construc-

tion project which is at the heart of the underlying dispute. Because of his knowledge of the site, Willett, like Morris, was listed by his em-

gained an unfair advantage by improperly contacting and obtaining confidential or privileged information from former MMR employee Richard Willett pertaining to MMR's trial strategy and tactics in this case, thereby tainting the integrity of the trial process. Plaintiff contends that the disqualification of attorney Forstadt and the Schatz firm is the only appropriate remedy if public confidence in the judicial system is to be maintained. Thames vigorously disputes the impropriety of Forstadt's contact with Willett, as well as plaintiff's allegation that Forstadt actually received any confidential or privileged information about MMR's litigation strategy. Moreover, defendant claims that, even if Forstadt's conduct was in violation of the Rules, depriving it of its counsel of choice in this matter is too harsh a sanction.

The cases cited above provide the court with the appropriate framework within which to analyze the plaintiff's disqualification motion. If the motion is to be granted, the court believes that each of the following questions must first be answered affirmatively.

Did Willett have confidential or privileged information pertaining to MMR's trial preparation and strategy?

Assuming that Willett had such information, did he disclose it to attorney Forstadt?

If such information was disclosed to Forstadt, does his continued representation of Thames threaten to "taint" all further proceedings in the case?

A negative response to any of these questions will necessitate the denial of plaintiff's disqualification motion.

 It cannot be seriously disputed that Willett possessed confidential and privileged information about the case. After litigation of the case commenced, Willett functioned almost exclusively in the capacity of trial consultant and paralegal for MMR.[19] Willett's familiarity with the project, having worked at the construction site longer than any other MMR employee, made him uniquely suited to his new role of assisting plaintiff's counsel with their pretrial preparation for the litigation. As indi-

ployer as a fact witness who might also render expert testimony in the case. Similarly, Willett became an "indispensable" member of his employer's litigation preparation efforts, and in his capacity as a *de facto* trial consultant and/or paralegal, was privy to confidential information regarding plaintiff's litigation strategy. Like Morris, Willett was offered money by defense counsel as an inducement to switch sides in the litigation. The principal distinction between Messrs. Willett and Morris is that Morris had entered into an actual consulting agreement with MGM to assist with its trial preparation, whereas, after MMR declared bankruptcy, Willett remained unemployed until he was contacted by attorney Forstadt. However, the fact that Willett was not under contract appears to have been largely a function of the post-bankruptcy haze, Willett's status as a trial consultant being put in limbo until he was officially offered a job by Aetna sometime in June, 1990. Even if Willett's non-contractual status suggests that he was not a "party" to the lawsuit within the meaning of Rule 4.2 of Professional Conduct, (A lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so), the absence of a contract with Aetna in no way alters the essence of Willett's ongoing consulting relationship with plaintiff's attorneys. Finally, the fact that so few cases have cited *MGM* does

not, as defendant maintains, suggest that the court's reasoning in that case is suspect, but rather that there are so few attorneys who would even begin to consider such an "egregiously underhanded, willful and knowing raid of an opposition's expert" *Geralnes B.V. v. City of Greenwood Village,* 609 F.Supp. 191, 193 (D.Col.1985), as occurred in that case.

19. The fact that Willett was not an attorney is irrelevant to the court's consideration of his ability to assist plaintiff's counsel in the preparation for litigation. As the *Williams* court noted:

Non-lawyer personnel are widely used by lawyers to assist in rendering legal services. Paralegal, investigators, and secretaries must have ready access to client confidences in order to assist their attorney employers. If information provided by a client in confidence to an attorney for the purpose of obtaining legal advice could be used against the client because a member of the attorney's non-lawyer support staff left the attorney's employment, it would have a devastating effect both on the free flow of information between client and attorney and on the cost and quality of the legal services rendered by an attorney.

*Williams, supra,* 588 F.Supp. at 1044.

cated above, Willett set up plaintiff's document control system, reviewed, indexed and digested documents obtained by MMR during discovery, prepared reports and analyses about the issues raised by the litigation, and assisted counsel in preparing for depositions and in answering interrogatories. Willett frequently attended meetings in which confidential litigation strategies were discussed, and was copied on numerous confidential, litigation-related letters and memoranda distributed among plaintiff's counsel, as well as letters and memoranda sent by Smith & Currie attorneys to parties interested in the litigation, including attorneys at the Schatz firm.[20] Even after he was transferred to Greenville, North Carolina in December of 1989, Willett maintained contact with and continued to provide assistance to attorneys at Smith & Currie.

Defendant's contention that Willett was merely a "document clerk" whose knowledge bearing on the litigation is purely factual in nature is inaccurate at best, and misleading at worst.[21] While it is true that Willett had only limited responsibilities while serving as office manager at the construction site between December, 1987 and February, 1988—responsibilities accentuated by the defendant—his role for MMR changed after its contract with Thames was terminated. For fully ten months following MMR's termination, Willett served almost exclusively as a trial consultant and paralegal, responsibilities barely acknowledged by the defendant.[22] As such, Willett's factual knowledge and opinions about the construction project were most likely shaped, in large measure, by his post-termination review of records and documents provided to him by plaintiff's counsel and by his discussions with them about the case. Moreover, in his role as trial consultant/paralegal, Willett had access not merely to confidential information regarding the project itself, but also about the plaintiff's litigation strategy. Willett's extensive contact with plaintiff's counsel, and his access to confidential litigation materials distinguishes him from a mere adverse fact witness with whom defense counsel would have been entitled to discuss the case outside the presence of MMR's attorneys. See IBM Corporation v. Edelstein, 526 F.2d 37, 41–42 (2nd Cir.1975) (Counsel for all parties have the right to interview an adverse party's witnesses in private without the presence or consent of oppos-

**20.** An *in camera* review of materials submitted to the court by MMR during oral argument reveals, *inter alia,* various invoices and demands for payment submitted by MMR's subcontractors, numerous letters written by Richard Willett to Smith & Currie attorneys, letters from Smith & Currie attorneys, including letters to attorney Forstadt, copies of which were sent to Willett, requests for interrogatories served upon MMR by Thames Associates that were forwarded to Willett for his input, inter-office memoranda discussing litigation-related matters in which Willett had or was participating, as well as confidential reports prepared by Willett at the request of plaintiff's counsel addressing matters in the litigation. The centrality of Willett's role in assisting in the preparation of plaintiff's case is also reflected in Smith & Currie's client billing records, which have also been reviewed by the court *in camera,* in which Willett's name is specifically mentioned over 200 times between January, 1989 and June, 1990, nearly twenty of which listings occurred after March, 1990.

**21.** The record strongly suggests that defense counsel, and perhaps even attorney Forstadt himself, knew or at least should have known about the important role played by Willett in MMR's trial preparation efforts. Among other things, Willett (1) informed Forstadt that he had worked with counsel for Aetna and MMR and had possession of privileged documents before he was hired as a consultant for Thames; (2) was listed by MMR as an individual who provided answers to interrogatories propounded by Thames; (3) was listed in answers to interrogatories as an individual who might render expert testimony; (4) attended a number of meetings on behalf of MMR and assisted plaintiff's counsel during document discovery sessions at which Forstadt or other members of his firm were also in attendance.

**22.** Thus, this is not a case in which plaintiff and Aetna "refuse to focus on [the fact] that Mr. Willett had a life and existence prior to becoming a purported member of their litigation team," Thames Associates' Supplemental Memorandum in Opposition to MMR's Motion to Disqualify at 6–7, but rather the defendant which has failed to acknowledge the significant litigation services provided by Willett after MMR was terminated from the project and once litigation in the case commenced.

ing counsel).[23]

■ Having concluded that Willett obtained confidential information about the case while assisting MMR's attorneys, the court must now consider whether he disclosed such information to Thames' counsel. In making this assessment, a presumption arises that confidences were, in fact, shared by Willett with attorney Forstadt. *Hull, supra,* 513 F.2d at 572; *Goldenberg, supra,* 189 Conn. at 512, 457 A.2d 296; *Williams, supra,* 588 F.Supp. at 1043; *Kapco, supra,* 637 F.Supp. at 1236. The parties do not so much disagree with the application of such a presumption, as they dispute whether the presumption is legally rebuttable. As is indicated above, the courts which have considered this question are split. Although the opinions in both *Hull* and *Williams* arguably suggest that the presumption is to be considered irrebuttable, such conclusions must be considered as dicta in light of factual evidence in both cases that confidential information was actually disclosed by the individual switching sides to opposing counsel. The Connecticut Supreme Court's embrace of an irrebuttable presumption in *Goldenberg*[24] is countered by the opinion of the district court for the Northern District of Illinois in *Kapco,* relying on Seventh Circuit precedent, which held to the contrary. Fortunately, the court need not resolve this difficult question, because even if the presumption of shared confidences is legally rebuttable, the court finds that the defendant has failed to sustain its burden to rebut that inference here.

In support of its claim that no confidential information was ever disclosed by Willett or received by Forstadt, Thames relies solely upon Willett's deposition testimony and affidavits submitted by attorney Forstadt and a Thames technical consultant, Richard Sieracki. Of course, it is impossible to know for certain what information was actually discussed at attorney Forstadt's meeting with Willett on June 19, 1990. Defendant's oft-repeated contention that there was no breach of plaintiff's confidences held in trust by Willett rings hollow, however, in light of Willett's own admission that, as a lay person, he did not know what information or communications were protected by the attorney-client privilege, *See* Willett deposition at 60–61. As such, Willett was not, as the defendant claims, in a position to differentiate between disclosable and non-disclosable information without the assistance of counsel. Moreover, given their undeniable interest in preserving any tactical advantage they may have garnered, the court does not find availing Forstadt's or Sieracki's assertions that no confidential and/or privileged information was consciously or unconsciously revealed to them during their interview of

**23.** Defendant also relies on *Amarin Plastics, Inc. v. Maryland Cup Corporation,* 116 F.R.D. 36 (D.Mass.1987), *PPG Industries, Inc. v. BASF Corporation, et al.,* 134 F.R.D. 118 (W.D.Pa.1990) and *Oak Industries v. Zenith Industries,* Civil No. 86–C–4304, 1988 WL 79614, 1988 Lexis 7985 (N.D.Ill. July 25, 1988) in support of its claim that attorney Forstadt was entitled to interview Willett outside the presence of MMR's counsel. However, neither *Amarin, PPG* nor *Oak Industries* are controlling here since none considered the propriety of an attorney making unauthorized contact with a former employee of his corporate adversary who had an ongoing relationship with opposing counsel as a trial consultant and paralegal up through the time of the *ex parte* contact.

**24.** Relying on a single sentence, the defendant unpersuasively attempts to argue that *Goldenberg* does not stand for the proposition that the presumption of shared confidences is an irrebuttable one. The passage referred to by the

defendant, when read in context, suggests only that the courts should not presume that an attorney who has not previously represented his current adversary possesses confidential information about that adversary. The *Goldenberg* court, finding that attorney Flaherty had, in fact, had an attorney-client relationship with Avco, his former client, and therefore that he possessed confidential information about the company, irrebuttably presumed that Flaherty had disclosed the information in his possession to the attorney representing Avco's adversary in the litigation, Corporate Air, upon his becoming affiliated with them. *See infra,* at p. 721. There is nothing in the *Goldenberg* opinion to suggest that the court's finding of an irrebuttable presumption of shared confidences turned on Flaherty's having been an attorney, or that such a presumption would not also apply to an individual who had obtained confidential information as a result of having been employed in some other "substantial relationship." *See Kapco, supra,* 637 F.Supp. at 1237.

Willett. To the contrary, these self-serving protestations fail to "clearly and effectively" rebut the presumption that confidential information was exchanged at the June 19, 1990 meeting between attorney Forstadt and Richard Willett.

■ Finally, the court concludes that attorney Forstadt's continued representation of Thames Associates threatens to taint the integrity of this case because the confidential information he presumably received from Willett creates at least an appearance that defendant has obtained an unfair advantage at trial. This is not simply a case in which defense counsel unknowingly spoke with a prospective witness with knowledge of the facts surrounding the underlying litigation. Here, counsel not only interviewed Willett, a member of his adversary's litigation team, but sought to hire him for defendant's exclusive use. To condone such conduct, and simply allow Willett to switch camps could, by potentially giving Thames unrestricted access to plaintiff's trial strategies and tactics, have a devastating effect on the outcome of the litigation. Even if, as defendant maintains, no confidential information was actually disclosed, Forstadt's alliance with Willett creates a "nagging suspicion" that Thames' preparation and presentation has already been unfairly benefitted. At the very least, Forstadt's contact with Willett has likely stripped MMR of a valuable litigation resource whose services to the plaintiff are not likely to be easily replaced.

There is little reason to believe that Forstadt had any interest in hiring Willett other than in obtaining information to which he was not entitled, since if all he

sought were the facts known to Willett regarding the construction project, he was free to depose him. Such "extra-discovery" conduct cannot be excused by the fact that Willett initiated the original contact. If anything, Willett's inquiry should have put Forstadt on notice that, as a lay person, Willett was unaware of, or unwilling to abide by, his duty to maintain the confidentiality of any privileged information that he possessed.[25] Forstadt concededly was aware that Willett was privy to such information, See Forstadt letter dated June 26, 1990, *supra* at n. 6, and, as such, was himself duty-bound not to attempt to induce Willett to communicate such information to him. Nevertheless, rather than simply reject Willett's overture, and remind him of his legal responsibilities, Forstadt instead offered him a contract to desert his former employer and become an exclusive trial assistant for the defendant. Conduct of this sort can hardly be said to demonstrate "a cautious regard for the disciplinary rules," *Geralnes, B.V., supra,* 609 F.Supp. at 193, for, at the very least, a prudent attorney would have inquired of plaintiff's counsel regarding their relationship with Willett prior to offering him a consulting contract. Certainly prudence dictated that Forstadt withdraw his offer to Willett once he was contacted by Smith & Currie attorney David Dial. To allow Forstadt to develop his relationship with Willett, and Thames to reap the benefits of such an alliance, would most certainly taint any future trial of this matter.

The court concludes that the only way to remove such a taint is to sever the connection between Forstadt, the Schatz firm,[26]

---

**25.** Willett was likely unable, because of his personal financial situation, or unwilling, because of his resentment toward MMR for failing to pay him, to protect the confidentiality of such information.

**26.** There is nothing in the record to suggest that the Schatz firm made any effort to preclude attorney Forstadt from discussing with other attorneys at the firm the confidential information he received from Willett. Accordingly, the court concludes that the firm's continued presence in this litigation might also taint the case, *Papanicolaou, supra,* 720 F.Supp. at 1085–87, and it must therefore be disqualified from pro-

viding further representation. Disqualification of the Schatz firm, which has billed 7,500 hours, reviewed over 35,000 documents, and participated in depositions with transcripts numbering over 6,000 pages, will undoubtedly work a serious hardship on the defendant. This hardship can be reduced, however, by allowing counsel's work product and other information developed *prior to* June 19, 1990 to be turned over to new counsel retained by Thames, and by allowing for limited consultation with disqualified counsel for the purposes of explaining the work product. Of course, no information is to be communicated to or discussed with new counsel that was developed after Forstadt's discussions

728

and Mr. Willett. While the court is reluctant to disqualify counsel, this appears to be one of those "unusual situations" where the appearance of impropriety is clearly sufficient to warrant so drastic a remedy. As the Second Circuit has admonished:

> The dynamics of litigation are far too subtle, the attorney's role in that process is far too critical, and the public's interest in the outcome is far too great to leave room for even the slightest doubt concerning the ethical propriety of a lawyer's representation in a given case.

*Emle Industries, supra,* 478 F.2d at 571. While the court is concerned about interfering with Thames' right to freely select counsel of its choice, that concern is outweighed by MMR's interest in a trial free from the risk that confidential information has been used against it and in the public's interest in the integrity of the judicial process itself. Accordingly, plaintiff's motion for disqualification is granted.

*Conclusion*

For the reasons stated more fully above, plaintiff's motion to disqualify defense counsel Matthew Forstadt and the law firm of Schatz & Schatz, Ribicoff & Kotkin is granted.

SO ORDERED.

with Willett. *See Williams, supra,* 588 F.Supp. at 1046–47.